

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Universidad de Puerto Rico<br><br>     Peticionarios<br><br>          v.<br><br>Gabriel Laborde Torres y otros<br><br>     Recurridos | Certiorari<br><br>2010 TSPR 225<br><br>180 DPR ____ |

Número del Caso: CT-2010-8

Fecha: 13 de diciembre de 2010

Abogados de la Parte Peticionaria:

          Lcdo. Raúl M. Arias Marxuach
          Lcda. Maralyssa Álvarez Sánchez

Abogados de la Parte Recurrida:

          Lcdo. Alex O. Rosa Ambert
          Lcdo. Luis José Torres Asencio
          Lcdo. José J. Nazario de la Rosa
          Lcdo. Juan Santiago Nieves
          Lcdo. Manuel A. Rodríguez Banchs
          Lcdo. César A. Rosado Ramos
          Lcdo. Hans S. Perl Matanzo
          Lcdo. Carlos Cotto Cartagena
          Lcdo. Enrique G. Juliá Ramos
          Lcdo. Edgardo L. Rivera Rivera
          Lcdo. Harry Anduze Montaño
          Lcdo. Frank Torres Viada
          Lcdo. Gaspar Martínez Mangual

Materia: Certificación

Este documento constituye un documento oficial del   Tribunal Supremo que está sujeto a los cambios y correcciones del pr   oceso de compilación y publicación oficial de las decisiones   del Tribunal. Su distribución electrónica se hace como un servici   o público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Universidad de Puerto Rico

      Peticionarios

         v.

                         CT-2010-008

Gabriel Laborde Torres y otros

      Recurridos

Opinión del Tribunal emitida por el Juez Asociado señor MARTÍNEZ TORRES.

En San Juan, Puerto Rico, a 13 de diciembre de 2010.

La Universidad de Puerto Rico (U.P.R.) nos solicita, mediante este recurso de certificación intrajurisdiccional, que revisemos una determinación del Tribunal de Primera Instancia, Sala Superior de San Juan. En ella se desestimó por académica una solicitud de *injunction* permanente, un interdicto posesorio y una orden de cese al amparo del Artículo 277 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 2761, contra varios líderes estudiantiles. El foro primario entendió que el reclamo de la U.P.R. se tornó académico, ya que el riesgo de que la protesta estudiantil se reanudara e interrumpiera las

labores en la universidad era incierto. Sin embargo, la U.P.R. estima que la controversia sigue viva, ya que los estudiantes aprobaron un"voto de huelga preventivo" en una asamblea el 21 de junio de 2010. Según la U.P.R., ello redunda en que el cambio en la conducta de los estudiantes no tuvo visos de permanencia y que el conflicto continuará. Ese hecho, nos indica la U.P.R., es de conocimiento general, por lo que nos invita a que tomemos conocimiento judicial al respecto.

La U.P.R. alega que en este pleito aplica una de las excepciones a la doctrina de academicidad. A saber, cuando una situación de hechos es cambiada, pero no tiene características de permanencia, el pleito no es académico. Bajo ese fundamento, la U.P.R. nos requiere que revoquemos al foro primario y que atendamos el pleito por su alto interés público. Además, la U.P.R. solicita que, de entender que el caso no es académico, nos expresemos sobre ciertos aspectos de la controversia relacionados al derecho a la libre expresión.

Por su parte, los estudiantes recurridos alegan que la controversia de autos fue resuelta mediante un proceso de mediación, el cual culminó con la suscripción de un acuerdo entre las partes aprobado por el Tribunal de Primera Instancia. Por lo tanto, entienden que todas las causas de acción son académicas, salvo las de daños y perjuicios que continúan ante la consideración del Tribunal de Primera Instancia. Los estudiantes recurridos

aducen, contrario a la U.P.R., que la probabilidad de que ellos incurran nuevamente en los actos que motivaron la solicitud de *injunction* permanente es "patentemente especulativa". Sobre este particular, enfatizan que la composición de los estudiantes en este nuevo año académico es distinta.

De entrada, concluimos que la U.P.R. tiene razón. Pese a los esfuerzos de mediación entre las partes, los estudiantes recurridos han actuado de una manera que refleja que su conducta no fue de carácter permanente y que fue un subterfugio para evadir la revisión judicial. El hecho de que los estudiantes reunidos en asamblea aprobaron un "voto de huelga preventivo" es indicativo de que sus actos al levantar el conflicto no tenían visos de duración. Es más, del mismo acuerdo entre las partes surge que algunas controversias subsistirían, como es el caso de la cuota especial. Por tal razón, el cambio en conducta de los recurridos da base a la aplicación de una excepción a la doctrina de academicidad. Sin duda, luego de la aprobación de un "voto de huelga preventivo", el cual es de conocimiento público, el asunto subsumido en este caso merece nuestra atención por el alto interés público de la controversia.

## I

Como se sabe, la Universidad de Puerto Rico ha sido objeto de múltiples protestas estudiantiles durante décadas. Muchas de ellas han generado gran tensión en

Puerto Rico. Véase por ejemplo de forma general, L. Nieves Falcón, I. Cunningham, I. Rivera, F. Torres, H. Amundaray, Huelga y sociedad: Análisis de los sucesos en la U.P.R. 1981-1982, España, Ed. Edil, 1982. Desafortunadamente cada vez que se genera una de estas manifestaciones, se crean polémicas entre estudiantes, la administración y terceros ajenos a la comunidad universitaria. Esos conflictos no son siempre de resolución fácil e inmediata. Precisamente, la controversia que hoy nos ocupa tiene su origen en la más reciente protesta estudiantil que mantuvo paralizado al sistema universitario más grande del territorio por 62 días consecutivos. De hecho, sucesos relacionados a la misma protesta estudiantil dieron pie a nuestra Opinión de 10 de mayo de 2010, en Moreno v. Pres. U.P.R. II, 2010 T.S.P.R. 70, 2010 J.T.S. 79, 178 D.P.R. ___ (2010).

Tal y como indicáramos entonces, el 13 de abril de 2010 se celebró una Asamblea General de Estudiantes convocada por el Presidente del Consejo General de Estudiantes, el Sr. Gabriel Laborde Torres. Allí se aprobó un "paro" de 48 horas, para los días 21 y 22 de abril y se creó un Comité Negociador. Llegado el 21 de abril, se inició la protesta estudiantil y los estudiantes cerraron los portones del Recinto de Río Piedras. La U.P.R. expone que ese día unas personas encapuchados forcejearon con los guardias universitarios y cerraron los portones con cadenas. Además, alega que

hubo varios incidentes de violencia en las afueras y dentro del Recinto. Como consecuencia de tales actos, la Rectora decretó un receso académico indefinido al entender que la administración perdió el control del acceso a la universidad.

Ante la situación que vivía el Recinto de Río Piedras, el 21 de abril de 2010 la U.P.R. presentó en el Tribunal de Primera Instancia una "Demanda Jurada" en la que solicitó un entredicho provisional, un *injunction* preliminar y un *injunction* permanente. La U.P.R. requirió a varios líderes estudiantiles que desistieran de impedir el acceso al Recinto de Río Piedras.[1] Posteriormente, se enmendó la demanda para incluir una reclamación en daños y perjuicios y se solicitó un interdicto posesorio. Asimismo, se instó al tribunal a que concediera una orden al amparo del Artículo 277 del Código de Enjuiciamiento Civil, supra.

En síntesis, la U.P.R. solicitó que: (1) los estudiantes devolvieran el control del Recinto de Río Piedras a la administración; (2) que abandonaran las facilidades mientras estuviera vigente el receso

---

[1] Inicialmente la demanda incluyó a Gabriel Laborde, Rosaly Motta, Roberto Thomas, Víctor Rodríguez, Waldemiro Vélez Soto, Adriana Mulero, entre otros. Posteriormente, se añadió a Santiago Velázquez Lamela, Verónica Guzmán Correa, Aníbal González Mictil, Adriana Berríos Pérez, María Currutherd Ferrero, Arturo Ríos Escribano, Rashid Marcano Rivera, Giovanni Roberto Cáez, René Vargas Martínez, Jean Carlo Bonilla Rivera, David Carrasquillo Medero, Aníbal Núñez González, José García Oquendo, Miriam Ruiz Rapala e Ian Camilo Cintrón Moya.

académico; (3) no impidieran la entrada al Recinto de Río Piedras de todas aquellas personas que fueran autorizadas por las autoridades universitarias y que no incurrieran en violencia e intimidación contra estas personas; (4) no causaran daño a la propiedad, y (5) removieran las barricadas que impedían el acceso. La U.P.R. también solicitó el interdicto posesorio con la intención de que se les devolviera su propiedad, y un mandato de "cese y desista" para restablecer el orden institucional. Finalmente, la U.P.R. pidió una compensación por los daños y perjuicios que alegadamente sufrió.

Tras varios trámites procesales, entre los cuales se concedió un entredicho provisional y un interdicto preliminar, el 11 de junio de 2010 el Tribunal de Primera Instancia ordenó a las partes acudir a un proceso de mediación para dirimir sus conflictos, entre los cuales se encontraba un aumento en la cuota académica. Las partes seleccionaron como mediador al Lcdo. Pedro López Oliver. El proceso de mediación comenzó el 12 de junio de 2010 y culminó el 16 de junio de 2010 con la suscripción de un acuerdo entre las partes. Ese acuerdo lo firmaron todos los miembros del Comité Negociador y nueve de los trece miembros de la Junta de Síndicos de la U.P.R.

Con relación a la cuota, según dispuso la sentencia del Tribunal de Primera Instancia, el acuerdo entre las partes recogió lo siguiente:

1. La administración universitaria se compromete a no imponer una cuota en la primera sesión académica del año académico 2010-2011.

2. La Junta de Síndicos considera que será necesaria el establecimiento de una cuota a partir de enero de 2011. Sin embargo, la Junta de Síndicos se compromete a que, de establecer dicha cuota, ésta no será mayor de la cantidad que representa el aumento en la Beca Pell para los años 2009-10 y 2010-11, tomando como base lo que se recibiría de la Beca Pell en el 2008-2009.

3. **Lo antes dispuesto no debe ser entendido como una aceptación del Comité Negociador Nacional, representantes de los estudiantes en este proceso de mediación, a la imposición de un aumento en los costos de estudio a partir de enero de 2011.**

> Sentencia Parcial y Orden del Tribunal de Primera Instancia del 29 de junio de 2010, pág. 7 [énfasis suplido].

El Tribunal de Primera Instancia ordenó unir al expediente judicial el acuerdo titulado "Entendidos entre la Administración de la Universidad y el Comité Negociador Nacional". Ese documento fue certificado por la Junta de Síndicos y, posteriormente, por los estudiantes. Para ello, los líderes estudiantiles convocaron una asamblea para el 21 de junio de 2010, en la cual llevaron a votación los convenios entre las partes. Allí, entre otras cosas, se ratificó el acuerdo producto del proceso de mediación y se emitió un "voto de huelga preventivo" para repudiar la imposición de una cuota especial en enero de 2011.

Como consecuencia del convenio, el Tribunal de Primera Instancia ordenó a las partes mostrar causa por lo cual no debía desestimar la "Demanda Enmendada Jurada"

presentada por la U.P.R. y la "Reconvención y Demanda Contra Tercero" que presentaron los estudiantes Verónica Guzmán Correa y René Vargas Martínez.[2] Mediante moción en cumplimiento de orden la U.P.R. expuso que la solicitud de *injunction* permanente y la reclamación de daños y perjuicios no eran académicas. Explicó que sólo hubo un cese voluntario temporero de la conducta que el *injunction* permanente busca evitar y que ya había amenazas de que la gesta de los estudiantes se repetirá. La U.P.R. alegó que existe una posibilidad real de que se impida el libre acceso al Recinto de Río Piedras en un "futuro cercano" ya que los estudiantes emitieron, en la Asamblea General, un "voto de huelga preventivo" en repudio a la imposición de una cuota especial efectiva en enero 2011.

Por lo tanto, la U.P.R. insistió en que no se desestimara el *injunction* permanente y la causa de daños y perjuicios. Aseguró que las expresiones realizadas por algunos líderes estudiantiles en la asamblea eran indicio de que próximamente iniciaría otra protesta, lo que hace que el conflicto entre las partes siga vivo. En cuanto al acuerdo producto de la mediación, la U.P.R. indicó que éste no era un acuerdo de transacción ya que no

---

[2] Estos codemandados instaron una "Reconvención y Demanda Contra Terceros" en la que reclaman a la Presidenta de la Junta de Síndicos, Lcda. Ygrí Rivera, y al Presidente de la Universidad, Dr. José Ramón de la Torre, en su carácter personal, por los daños que alegadamente han sufrido por la publicación de documentos confidenciales y por un supuesto abuso de los procedimientos judiciales.

"pretendió aclarar las relaciones jurídicas objeto de este pleito mediante concesiones recíprocas de las partes".

Por su parte, los líderes estudiantiles codemandados se opusieron a la moción y aseveraron que la controversia se resolvió con el acuerdo suscrito el 16 de junio de 2010 en mediación. Mencionaron que la U.P.R. intenta mantener viva una controversia de forma disfrazada y que realmente es altamente especulativo que se genere otra huelga. Aducen que la U.P.R. retomó el control del recinto y que los portones fueron abiertos. Éstos entienden que ambos aspectos son el núcleo del remedio interdictal que solicitó la U.P.R. Alegan, además, que de ocurrir una huelga en el futuro, otros serían los estudiantes participantes, puesto que la composición estudiantil cambió. Por lo tanto, sostienen que, en ese momento, la U.P.R. podría acudir a la vía judicial.

El 29 de junio de 2010, el Tribunal de Primera Instancia emitió "Sentencia Parcial y Orden" en la que desestimó por académica la solicitud de *injunction* permanente, interdicto posesorio, y la orden de cese al amparo del Artículo 277 del Código de Enjuiciamiento Civil, supra, que presentó la U.P.R. También ordenó que la reclamación de daños y perjuicios de la U.P.R. y la demanda de terceros de los codemandados, se tramitaran en un pleito ordinario. Con ello, concluyó que la mediación corrigió todos los conflictos entre las partes.

Cabe señalar que el Tribunal de Primera Instancia hizo constar en su sentencia, bajo el título de "hechos posteriores a la mediación", que "varios codemandados, algunos sobre los cuales no tenemos jurisdicción por no haber sido emplazados, alegadamente emitieron comentarios públicos sobre la posibilidad de otro proceso huelgario". Sentencia Parcial y Orden del Tribunal de Primera Instancia, pág. 8. El foro primario no otorgó importancia a esos comentarios y entendió que el acuerdo de mediación hizo académica la controversia entre las partes.

Oportunamente, la U.P.R. presentó un recurso de apelación ante el Tribunal de Apelaciones. Allí señaló que el Tribunal de Primera Instancia erró al concluir que la causa de acción de *injunction* permanente era académica. La U.P.R. sostuvo que el cese voluntario de la conducta de los demandados no tiene carácter de permanencia y que la huelga en un futuro cercano no es incierta. Indicó que les correspondía a los demandados establecer que no hay expectativa razonable de una próxima huelga, cosa que según estiman éstos no hicieron.

El 10 de julio de 2010, la U.P.R. presentó un recurso de certificación ante este Tribunal. Alega que existen cuestiones de alto interés público relacionadas a asuntos constitucionales sustanciales que ameritan que traigamos el pleito ante nuestra consideración. Nos solicita que adelantemos el trámite judicial por la importancia y pronta atención que requiere este

conflicto. Además, invoca que de no hacerlo se vulnera el interés de la U.P.R. en mantener su misión como el primer centro docente del país. Para ello, la U.P.R. considera que debe proteger las tareas institucionales y que debe imperar el orden en la universidad. Precisa que el *injunction* permanente tiene el propósito de mantener la continuidad de las funciones académicas y administrativas, asegurando que el desempeño de las tareas se lleve a cabo de forma ordenada y segura, sin menoscabar el ejercicio del derecho a la libertad de expresión de los estudiantes. Por lo tanto, la U.P.R. nos invita a discutir los medios y formas en que tales manifestaciones se pueden generar. Ello, según aduce la U.P.R., amerita que este Tribunal se exprese sobre el tipo de foro que es la universidad y el alcance del derecho fundamental a la libre expresión dentro de ésta.

**II**

**A.   La certificación intrajurisdiccional.**

El Art. 3.002 de la Ley Núm. 22 de agosto de 2003, según enmendada, conocida como la Ley de la Judicatura de 2003, específicamente en sus incisos (e) y (f), 4 L.P.R.A. sec. 24s(e)(f), dispone los dos escenarios en los cuales, como parte de su competencia, este Tribunal puede atender asuntos mediante el auto de certificación. Ambos escenarios se diferencian a base de la procedencia del auto. Así, cuando los autos proceden del Tribunal de Primera Instancia o del Tribunal de Apelaciones se

denominan certificaciones intrajurisdiccionales y cuando proceden de alguno de los tribunales del sistema federal son conocidos como certificaciones interjurisdiccionales. Ahora bien, el tipo de certificación que nos atañe en esta ocasión es el intrajurisdiccional, el cual surge del Art. 3.002(e) de la Ley de la Judicatura, id. La disposición legal antedicha expresa que este Tribunal,

> [m]ediante auto de certificación, a ser expedido discrecionalmente, *motu proprio*, o a solicitud de parte, podrá traer inmediatamente ante sí para considerar y resolver cualquier asunto ante el Tribunal de Primera Instancia o el Tribunal de Apelaciones cuando se plantee la existencia de un conflicto entre decisiones previas del Tribunal de Apelaciones, se planteen cuestiones noveles de derecho, o se planteen cuestiones de alto interés público que incluyan cualquier cuestión constitucional sustancial al amparo de la Constitución del Estado Libre Asociado de Puerto Rico o de la Constitución de Estados Unidos. Id.

Así pues, el auto de certificación intrajurisdiccional "es un mecanismo de carácter discrecional que nos permite traer de inmediato ante nuestra atención asuntos que se encuentran ante la consideración de foros inferiores, obviando el trámite ordinario de los procedimientos." Rivera v. J.C.A., 164 D.P.R. 1, 7 (2005). Ello, como ya hemos mencionado, puede hacerse a solicitud de parte o *motu proprio*. Art. 3.002(e), supra. Es un recurso de carácter excepcional porque la norma preferida en nuestro ordenamiento es que los casos maduren durante el trámite ordinario para evitar así que el foro de última instancia se inmiscuya a destiempo. Rivera v. J.C.A., supra. Sin embargo, el auto

de certificación es el mecanismo adecuado para atender asuntos que requieren urgente solución, ya sea porque se afecta la administración de la justicia o porque el asunto es de tal importancia que exige una pronta atención. Id. Además, es un recurso que nos permite eliminar prácticamente la posibilidad de que algunos tipos de casos evadan nuestros pronunciamientos sobre los asuntos que éstos presentan. Presidente de la Cámara v. Gobernador, 167 D.P.R. 149, 160-161 (2006).

Por esa razón, hemos utilizado el auto de certificación en muchas ocasiones para atender controversias del más alto interés público. Véanse, entre otros, Moreno v. Pres. U.P.R. II, supra; Domínguez Castro et al. v. E.L.A. I, Op. de 2 de febrero de 2010, 2010 T.S.P.R. 11, 2010 J.T.S. 20, 177 D.P.R. ___ (2010), certiorari denegado el 4 de octubre de 2010 (09-1483), 562 U.S. ___ (2010); San Gerónimo Caribe Project v. E.L.A. I, Op. de 31 de julio de 2008, 2008 T.S.P.R. 130, 2008 J.T.S. 149, 174 D.P.R. ___ (2008); McClintock v. Rivera Schatz, 171 D.P.R. 584 (2007); Romero Barceló v. E.L.A., 169 D.P.R. 460 (2006); Rivera v. J.C.A., supra; Suárez v. C.E.E. I, 163 D.P.R. 350 (2005).

**B.   La controversia entre las partes.**

En este caso nos encontramos ante el cuestionamiento de si la solicitud de injunction permanente que presentó la U.P.R. por el cierre de su institución a raíz de la "huelga estudiantil" no es académica porque no tiene

visos de permanencia. En la solicitud de certificación la U.P.R. alega que aunque ya la institución está operando en su normalidad, sigue latente la amenaza porque el fin de la pasada "huelga" fue temporero. Los estudiantes recurridos alegan todo lo contrario en su escrito de oposición. Para ellos, el recurso es académico.

La controversia ante esta Curia presenta serias implicaciones sobre las funciones de la U.P.R. Esas funciones están revestidas del más alto interés público. Asimismo, el caso presenta interrogantes constitucionales sustanciales, relacionadas con los derechos de los estudiantes, que merecen nuestra intervención en estos momentos. Además, por la particularidad de los hechos, éste es uno de esos casos que podría escapar a nuestros pronunciamientos y que requiere una pronta atención. Por ello se cumplen los requisitos para la expedición del auto de certificación.

Por su parte, la Regla 50 de nuestro Reglamento, 4 L.P.R.A. Ap. XXI-A, dispone que este Tribunal se reserva la facultad "para prescindir de términos, escritos o procedimientos específicos a los fines de lograr el más justo y eficiente despacho del caso o del asunto de que se trate". En el caso particular ante nos, evaluados los escritos presentados por las partes, así como el resto del expediente, estamos en posición de resolver. Por eso, como ambas partes han comparecido y de conformidad con la facultad que nos otorga la Regla 50 de nuestro

Reglamento, procedemos a expedir el auto de certificación y a resolver el recurso.

### III

**A.   Conocimiento judicial de hechos adjudicativos.**

El primer asunto que debemos considerar es si el Tribunal de Primera de Primera Instancia erró al desestimar por académica la solicitud de *injunction* permanente.

La U.P.R. expone que aplica una de las excepciones a la doctrina de academicidad, porque la situación de hechos fue cambiada, pero sin visos de permanencia. La U.P.R. asegura que con la aprobación del "voto de huelga preventivo", los estudiantes solamente modificaron su comportamiento de manera temporera y sin firmeza. Así pues, nos requiere que tomemos conocimiento judicial al respecto.

Además, la U.P.R. nos solicita que consideremos "los comentarios recientes realizados en la prensa por parte de líderes estudiantiles, [los cuales] revelan que existe una probabilidad razonable de que se reorganice una protesta estudiantil en el futuro cercano". Sobre este particular, la U.P.R. nos indica que podemos también tomar conocimiento judicial. Nos cita varias manifestaciones de líderes estudiantiles publicadas en la prensa que muestran que las actuaciones de los estudiantes no tienen visos de permanencia. Por ejemplo, la U.P.R. nos presenta como anejo un artículo noticioso

en el que se cita al codemandado, Giovanni Roberto Cáez, declarando lo siguiente:

> En este primer "round" salimos victoriosos. Cuando uno gana el campeonato en la primera pelea, uno está dispuesto a ir a la segunda porque sabe que tiene posibilidades de ganar porque ya probó su fuerza y este movimiento ha probado la fuerza que tiene. Así que estamos listos para defender la universidad pública y evitar esa cuota en enero.

Apéndice, págs. 193 y 195.

De igual modo, la U.P.R. aneja otro artículo en el cual otro codemandado, José García, hizo una advertencia a la Junta de Síndicos sobre la implantación de la cuota en enero de 2011. Expresó que "si tenemos que hacer otra huelga, la haremos más combativa que ésta". Id., pág. 196. Asimismo, la U.P.R. adjunta otro artículo en el que una líder estudiantil del Recinto de Aguadilla, Yanira Ríos de Jesús,[3] exhortó a los estudiantes "a estar listos por si es necesario otro proceso huelgario, en caso de que la Administración decida implantar la cuota o incrementar el costo de los créditos, uno de los puntos que causó el tranque entre [sic] las negociaciones...". Id., pág. 201.

Por su parte, los estudiantes recurridos sostienen que los artículos de prensa citados son prueba de referencia que no es admisible y que, por lo tanto, no

---

[3] De los tres estudiantes que emitieron expresiones a la prensa, Yanira Ríos de Jesús es la única que no está incluida específicamente como demandada. Los estudiantes Giovanni Roberto Cáez y José García Oquendo son codemandados y recurridos en este pleito.

podemos tomarlos en consideración. Alegan también que es

"altamente especulativo" considerar que la "huelga" se

repetirá, pero de ello ocurrir, la U.P.R. puede acudir

oportunamente a los tribunales.

La Regla 201 de Evidencia de 2009, 32 L.P.R.A. Ap.

IV, trata sobre el conocimiento judicial de hechos

adjudicativos. Es decir, versa sobre los hechos que

"están en controversia de acuerdo con las alegaciones y

del derecho sustantivo que rige el asunto". Pérez v. Mun.

de Lares, 155 D.P.R. 697, 704 (2001); Asoc. de

Periodistas v. González, 127 D.P.R. 704 (1991). Esta

regla sustituyó la Regla 11 de Evidencia de 1979, la cual

fue interpretada en varias ocasiones por este Tribunal.

La Regla 201 de Evidencia de 2009, supra, dicta, en

lo pertinente, que:

> Regla 201. Conocimiento judicial de hechos adjudicativos
>
> (a) Esta Regla aplica solamente al conocimiento judicial de hechos adjudicativos.
>
> (b) El Tribunal podrá tomar conocimiento judicial solamente de aquel hecho adjudicativo que no esté sujeto a controversia razonable porque:
>
> (1) **es de conocimiento general dentro de la jurisdicción territorial del Tribunal,**
>
> (c) **es susceptible de corroboración inmediata y exacta mediante fuentes cuya exactitud no puede ser razonablemente cuestionada.**
>
> (d) El Tribunal podrá **tomar conocimiento judicial a iniciativa propia** o **a solicitud de parte.** Si es a solicitud de parte y ésta provee

información suficiente para ello, el Tribunal tomará conocimiento judicial.

(e)  ..............................

(f) El Tribunal podrá tomar conocimiento judicial en cualquier etapa de los procedimientos, **incluyendo la apelativa** [énfasis suplido]....

Como se sabe, el conocimiento judicial es un medio de prueba. Trata de establecer un hecho como cierto sin la necesidad formal de presentar evidencia. E.L. Chiesa, Tratado de Derecho Probatorio, Publicaciones J.T.S., 1998, Tomo II, Sección 13.1, pág. 1129. Por lo tanto, tomar conocimiento judicial de un hecho adjudicativo[4] significa que el hecho es aceptado como cierto sin necesidad de que la persona obligada presente evidencia de su veracidad. Ello es así porque el tribunal presume que la cuestión es tan notoria que no será disputada. Pese a ello, la parte contraria no está impedida de ofrecer prueba en contrario. Lluberas v. Mario Mercado e Hijos, 75 D.P.R. 7, 20 (1953).

_____

[4] Según expone el profesor Ernesto Luis Chiesa, los hechos adjudicativos son los vinculados con las alegaciones y los que pasan a la consideración del jurado. Esto los diferencia de los hechos legislativos, que son "aquellos que las partes y el tribunal toman en consideración con relación a los efectos sociales o económicos que podría tener la norma que se establecería de resolver de una u otra manera". E.L. Chiesa, Reglas de Evidencia de Puerto Rico 2009, Análisis por el Prof. Ernesto Chiesa, San Juan, Publicaciones J.T.S., 2009, pág. 103. Ello es pertinente, según el profesor Chiesa, ya que la Regla 201 aplica solamente a los "hechos adjudicativos." Regla 201(a). Por lo tanto, el tribunal puede tomar conocimiento de los hechos legislativos sin cumplir con los criterios del inciso (b).

El apartado (b) de esta regla establece los dos criterios por los cuales el tribunal puede adquirir conocimiento judicial. El primer criterio es la notoriedad del hecho, lo cual incluye el conocimiento general que exista en la jurisdicción. Asoc. de Periodistas v. González, supra, pág. 713. Como señala el profesor Chiesa, "a mayor generalidad el hecho, mayor probabilidad de que se puede tomar conocimiento judicial; a mayor especificidad más difícil es tomar conocimiento judicial". E.L. Chiesa, Reglas de Evidencia de Puerto Rico 2009, Análisis por el Prof. Ernesto Chiesa, San Juan, Publicaciones J.T.S., 2009, pág. 104. El profesor Chiesa utiliza como ejemplo el evento del "Milagro del Hudson". Indica que el tribunal puede tomar conocimiento judicial de que un avión descendió en ese río sin que nadie muriera. No obstante, éste no puede adquirir conocimiento judicial de los daños sufridos por un determinado pasajero. Id.

El segundo criterio que exhibe el inciso (b) de la regla, expone que debe ser un hecho cuya existencia no puede ser cuestionada. Tales hechos deben ser de determinación inmediata al recurrir a fuentes cuya exactitud no puede ser discutida. Al amparo de este criterio el hecho no tiene que ser notorio o de conocimiento general, sino de cómoda corroboración. Aquí lo esencial es que el hecho no se disputa porque es de

fácil verificación. E.L. Chiesa, Tratado de Derecho Probatorio, op. cit., pág. 1137.

Ahora bien, no basta con que el hecho sea notorio o indubitable, sino que debe ser también pertinente y admisible. Puesto que el conocimiento judicial es un atrecho al proceso evidenciario, el hecho tiene que ser uno que se hubiese podido probar con evidencia admisible. "El conocimiento judicial no tiene el efecto de hacer admisible lo que es objeto de una regla de exclusión" de evidencia. E.L. Chiesa, Reglas de Evidencia de Puerto Rico 2009, Análisis por el Prof. Ernesto Chiesa, op. cit., pág. 104.

Sin duda, la economía judicial y lo indeseable de que el juzgador rechace como falso lo que es a todas luces cierto, es el cimiento para la doctrina del conocimiento judicial. E.L. Chiesa, Tratado de Derecho Probatorio, op. cit., págs. 1130. "[L]os jueces no viven en un vacio. Sabemos lo que el resto de la comunidad sabe." Pueblo v. Marrero, 79 D.P.R. 649, 658 (1956). No obstante, el conocimiento judicial no se refiere al conocimiento personal del juez, sino al general que éste pueda tener de un hecho. E.L. Chiesa, Reglas de Evidencia de Puerto Rico 2009, Análisis por el Prof. Ernesto Chiesa, op. cit., pág. 104.

Por último, el tribunal puede tomar conocimiento judicial por su propia iniciativa o a solicitud de parte. En el segundo de los casos, la parte proponente debe

poner en posición al tribunal para tomar conocimiento judicial. Entonces, el tribunal debe acceder a la solicitud, especialmente si se trata de un hecho de fácil verificación. Si la parte promovente no provee la información, el tribunal rechazará la solicitud y la parte deberá entonces presentar evidencia para probar el hecho. Pérez v. Mun. de Lares, supra, pág. 705.

Conforme al derecho antes expuesto no cabe duda de que este Tribunal puede tomar conocimiento judicial de que el 21 de junio de 2010 se celebró una asamblea convocada por los estudiantes. Este hecho no sólo es de conocimiento general sino que es de fácil corroboración. Tampoco se cuestiona que en dicha fecha una mayoría de los estudiantes reunidos ratificaron un "voto preventivo de huelga". Este particular no ha sido cuestionado por los estudiantes.

Ahora bien, distinto son las expresiones citadas en el periódico que alegadamente hicieron varios estudiantes, que en su mayoría son codemandados-recurridos. Sin el beneficio de la prueba que se presente en un juicio, no hay manera de que podamos tomar como cierto el contenido de los artículos de periódicos que cita la U.P.R. Como se sabe, este Tribunal ha establecido como norma general que los artículos de periódicos no son admisibles para probar lo que en éstos se relata, porque son prueba de referencia. Pons v. Rivera Santos, 85 D.P.R. 524, 542 (1962). Evidentemente, los artículos de

los periódicos con las citas de lo que alegadamente dijeron los estudiantes, son prueba de referencia inadmisible para probar la certeza de lo allí citado. Por lo tanto, sobre ese particular los estudiantes recurridos tienen razón. Este Tribunal no puede, sin más, considerar ciertas esas expresiones.

Sin embargo, no debe existir duda alguna de que sí podemos tomar conocimiento judicial de que el 21 de julio de 2010 se realizó una asamblea de estudiantes y que allí se ratificó un "voto preventivo de huelga". Estos hechos son de conocimiento general y de fácil corroboración. Con ese hecho como premisa, debemos analizar si este pleito es académico como resolvió el Tribunal de Primera Instancia.

**B. Academicidad: excepción de cesación voluntaria sin visos de permanencia.**

Como se sabe, conforme al principio de justiciabilidad los tribunales limitan su intervención para resolver controversias reales y definidas que afectan las relaciones jurídicas de partes antagónicas u opuestas. E.L.A. v. Aguayo, 80 D.P.R. 552, 584 (1958). Conforme a ello, un tribunal de justicia no debe atender una controversia de carácter hipotético, abstracto o ficticio. Id. Esa limitación tiene el propósito de que los tribunales puedan precisar el momento oportuno para su intervención. Id.

Hemos señalado que un asunto no es justiciable cuando: (1) trata de resolver una cuestión política; (2)

una de las partes no tiene legitimación activa para promover un pleito; (3) después de comenzado un pleito, unos hechos posteriores lo convierten en académico; (4) las partes buscan obtener una opinión consultiva; o (5) se promueve un pleito que no está maduro. Noriega v. Hernández Colón, 135 D.P.R. 406 (1994). Como vemos, la doctrina de academicidad es una manifestación del principio de justiciabilidad.

La academicidad recoge la situación en que, aun cumplidos todos los criterios de justiciabilidad, ocurren cambios en los hechos o el derecho durante el trámite judicial que tornan académica o ficticia la solución del pleito. El Vocero v. Junta de Planificación, 121 D.P.R. 115, 123 (1988); Com. de la Mujer v. Srio. De Justicia, 109 D.P.R. 715, 724 (1980). La doctrina de academicidad busca: (1) evitar el uso innecesario de los recursos judiciales; (2) asegurar que haya la adversidad suficiente para que las controversias se presenten y defiendan competente y vigorosamente; y (3) evitar precedentes innecesarios. Com. de la Mujer v. Srio. De Justicia, pág. 725.

Un caso académico es aquel que intenta "obtener un fallo sobre una controversia disfrazada, que en realidad no existe, o una determinación de un derecho antes que éste haya sido reclamado, o una sentencia sobre un asunto, que al dictarse, por alguna razón no podrá tener efectos prácticos sobre una controversia existente".

P.P.D. v. Gobernador I, 139 D.P.R. 643, 675 (1995); E.L.A. v. Aguayo, supra, pág. 584. Conforme a ello, una controversia puede convertirse en académica cuando su condición viva cesa por el transcurso del tiempo. Emp. Pub. Des., Inc. v. H.I.E.T.E.L., 150 D.P.R. 924, 936 (2000).

Al considerar el concepto de academicidad hay que concentrarse en "la relación existente entre los eventos pasados que dieron inicio al pleito y la adversidad presente". Asoc. de Periodistas v. González, supra, págs. 717-718. Este análisis es trascendental para determinar la existencia de los requisitos constitucionales de justiciabilidad, especialmente cuando existen aspectos de la controversia que se tornan académicos pero persisten consecuencias colaterales de ésta que tienen vigencia y actualidad. Véase, R. Serrano Geyls, Derecho Constitucional de Estados Unidos y Puerto Rico, San Juan, Ed. C. Abo. P.R., 1986, Vol. 1, págs. 122-126. Por lo tanto, al examinar si un caso es académico, debemos evaluar los eventos anteriores, próximos y futuros, a fines de determinar si la controversia entre las partes sigue viva y subsiste con el tiempo. Pres. del Senado, 148 D.P.R. 737, 759 (1999). De no ser así, los tribunales están impedidos de intervenir.

No obstante, este Tribunal ha reconocido varias excepciones a la doctrina de **academicidad.** P.P.D. v. Gobernador I, supra, pág. 676. Tales excepciones son: (1)

una cuestión recurrente o susceptible de volver a ocurrir; (2) cuando la situación de hechos ha sido cambiada por el demandado, **pero no tiene visos de permanencia**; (3) cuando subsisten consecuencias colaterales que tienen vigencia y actualidad. Moreno v. Pres. U.P.R. II, supra; Angueira v. J.L.B.P., 150 D.P.R. 10, 19 (2000).

La U.P.R. alega que en este caso aplica la segunda excepción antes mencionada. Explica que los estudiantes realizaron un cambio a su conducta, pero sin la intención de que ese cambio fuera permanente. Asegura que la aprobación del "voto de huelga preventivo" es prueba de ello. Como indicáramos, podemos tomar conocimiento judicial del hecho de que hubo una asamblea de estudiantes en la cual se aprobó un voto preventivo de huelga. No podemos obviar que los intentos de concluir la controversia entre las partes mediante el acuerdo de mediación, a raíz de esa asamblea, no necesariamente fueron definitivos. En ese sentido creemos que la U.P.R. tiene razón en sus argumentos.

Este Tribunal nunca ha tenido la oportunidad de aplicar y abundar sobre la excepción de academicidad de cesación voluntaria sin visos de permanencia.[5] Sin

---

[5] En Presidente de la Cámara v. Gobernador, 167 D.P.R. 149 (2006), no aplicamos la excepción de cesación voluntaria sin visos de permanencia. Concluimos que el caso era académico porque no era probable que la controversia recurriera en el futuro. No obstante, la Juez Asociada señora Rodríguez Rodríguez emitió una opinión disidente
(continúa...)

embargo, existe múltiple jurisprudencia al respecto del Tribunal Supremo federal. Así, ese foro ha sostenido que el hecho de que un demandado desista voluntariamente de la conducta impugnada no priva automáticamente a un tribunal de su autoridad para determinar la legalidad de esa conducta. Friends of Earth, Inc. v. Laidlaw Environmental Services, Inc., 528 U.S. 167, 189 (2000); City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289 (1982). De lo contrario, se dejaría libre a la parte demandada para volver a sus antiguas usanzas. United States v. Concentrated Phosphate Export Ass'n, 393 U.S. 199, 203 (1968), citando a United States v. W.T. Grant Co., 345 U.S. 629, 632 (1953).

El Tribunal Supremo federal indicó que para determinar si un caso es académico por el cambio voluntario de una demandado se utiliza el escrutinio estricto. Friends of Earth, Inc. v. Laidlaw Environmental Services, Inc., supra. Por lo tanto, la culminación voluntaria de una conducta no tornará académica una controversia salvo que los eventos subsiguientes hagan absolutamente claro que no es razonable esperar que la alegada conducta impugnada volverá a ocurrir. Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1, 551

---

en la que señaló que no había garantía de que la parte recurrida no habría de repetir la misma conducta en el futuro. Opinó que debía aplicarse la excepción de cesación sin visos de permanencia y abundó un poco sobre este concepto y su aplicación por el Tribunal Supremo federal.

U.S. 701, 719 (2007) citando a <u>Friends of Earth, Inc. v. Laidlaw Environmental Services, Inc.</u>, <u>supra</u>, y a <u>United States v. Concentrated Phosphate Export Ass'n</u>, <u>supra</u> ("*subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur*").

Si un demandante impugna una acción y el demandado reacciona eliminándola, pero posteriormente continúa con una acción sustancialmente similar ("*substantially similar action*"), el caso no es académico. J.E. Nowak y R.D. Rotunda, <u>Constitutional Law</u>, 8va ed., West Pub., 2010, pág. 72. Concluir lo contrario dejaría en las manos de la parte demandada la continuación del pleito. Por eso, un caso es académico solo si: (1) puede asegurarse que la violación alegada no va a volver a ocurrir; y (2) el remedio provisional concedido o los eventos acaecidos han erradicado completa e irrevocablemente los efectos de la violación alegada. <u>County of Los Angeles v. Davis</u>, 440 U.S. 625, 631 (1979).

En el caso normativo <u>United States v. W.T. Grant Co.</u>, <u>supra</u>, el Tribunal Supremo señaló:

> *Both sides agree to the abstract proposition that **voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case**, i.e., does not make the case moot.... A controversy may remain to be settled in such circumstances.... **The defendant is free to return to his old ways.** This, **together with a public interest in having the legality of the practices settled, militates against a mootness conclusion**.... For to say that the case has become moot means that the defendant is entitled to a dismissal as a*

*matter of right,.... The courts have rightly*
*refused to grant defendants such a powerful*
*weapon against public law enforcement* [citas
omitidas; énfasis suplido].

El peso de la prueba recae en la parte que alega que
el pleito es académico. Es decir, le corresponde a ésta
demostrar que el cambio de conducta para culminar la
controversia es permanente y no es razonable esperar que
revierta. Friends of Earth, Inc. v. Laidlaw Environmental
Services, Inc., supra(*"the heavy burden of persuading the
court that the challenged conduct cannot reasonably be
expected to start up again lies with the party asserting
mootness".*). En ese sentido, si la parte demandada puede
probar que no existe una expectativa razonable de que la
conducta impugnada se repita, entonces el caso es
académico. United States v. W.T. Grant Co., supra.

En vista del derecho antes expuesto, los estudiantes
recurridos tienen el peso de la prueba para establecer
que su conducta con relación al fin de la huelga es
permanente. El acuerdo al que llegaron las partes tras la
intervención de un mediador no tuvo el propósito de
terminar con la litigación. Ninguna de sus cláusulas
contiene un compromiso de desistir del pleito. El único
objetivo fue levantar la "huelga estudiantil" que
imperaba entonces a cambio de una posposición hasta enero
de 2011 del cobro de una cuota especial a los
estudiantes, entre otras cosas. Los estudiantes
recurridos hicieron constar expresamente en el acuerdo
producto de la mediación que rechazan esa cuota. Luego,

aprobaron un "voto preventivo de huelga." Eso mantiene viva la pugna que mantuvo a nuestro sistema universitario paralizado por meses.

Por ende, la controversia ante nuestra consideración se sitúa perfectamente en la excepción de academicidad antes expuesta. No existe una garantía real de que los estudiantes no habrán de incurrir en la conducta impugnada, especialmente luego de la aprobación del "voto preventivo de huelga". Por el contrario, su conducta es un indicio razonable de que podría volver a ocurrir otra paralización de la U.P.R. y que la intención de los estudiantes recurridos nunca fue culminar con la controversia de autos.

Si concluyéramos que el litigio es académico los estudiantes recurridos quedarían liberados de un dictamen judicial y podrían incurrir nuevamente en la conducta proscrita. Eso dejaría sin remedio a la U.P.R. a pesar de sus alegaciones de daño irreparable. La adjudicación judicial de ese reclamo no puede quedar al arbitrio unilateral de los estudiantes recurridos. Esto cobra más importancia cuando se trata de un asunto de tan alto interés público. Estamos ante la posible paralización de nuestro más alto centro público de enseñanza y la frustración de la misión social consagrada en la Ley de la Universidad de Puerto Rico. Es por ello que concluimos que este caso no es académico porque le aplica la excepción de cesación voluntaria sin visos de

permanencia. A pesar de los esfuerzos de mediación, la conducta posterior de los estudiantes abona a que la U.P.R. se sienta amenazada y nada impediría que los estudiantes retomen los actos que el *injunction* permanente busca evitar.

## IV

La U.P.R. ha solicitado un interdicto permanente contra los estudiantes recurridos, que ordene el cese de toda acción que impida el libre acceso al campus universitario. Por su parte, los estudiantes recurridos argumentan como defensas afirmativas que el remedio que la U.P.R. solicita implica un menoscabo de patente intensidad a su derecho a la libre expresión, que por ello requiere el escrutinio judicial más alto y acucioso posible. Toda vez que el Tribunal de Primera Instancia tendrá que aquilatar estos planteamientos al evaluar si emite la orden de *injunction* permanente que se le ha solicitado, es imperativo definir los contornos de los derechos constitucionales que se invocan como defensa. Nos aseguramos así de que se protejan los derechos legales y constitucionales de todas las partes en la comunidad universitaria.

A.    **Principios generales de la libertad de expresión**.

La Sec. 4 del Art. II de la Constitución de Puerto Rico consagra el derecho fundamental a la libertad de expresión. Art. II, Sec. 4, Const. E.L.A., L.P.R.A., Tomo 1. Como tal, nuestra Carta de Derechos protege al ciudadano puertorriqueño contra cualquier actuación gubernamental o "ley... que restrinja la libertad de palabra o de prensa o el derecho del pueblo a reunirse en asamblea pacífica y a pedir al gobierno la reparación de agravios". Id. Como corolario de la libre expresión, la Sec. 6 del artículo citado añade que "[l]as personas podrán asociarse y organizarse libremente para cualquier fin lícito, salvo en organizaciones militares o cuasi militares". Id., Sec. 6. Hemos expresado en el pasado que "[a]mbos derechos son fundamentales para la consecución y [el] ejercicio de la libertad de conciencia". Rodríguez v. Srio. de Instrucción, 109 D.P.R. 251, 255 (1979).

La garantía constitucional a la libertad de palabra "abarca el ámbito general de la libertad de conciencia, de pensamiento, de expresión, y las actividades propias para ejercitar a plenitud dentro de la más dilatada libertad la totalidad de los derechos". Muñiz v. Admor. Deporte Hípico, 156 D.P.R. 18, 23 (2002), citando a 4 Diario de Sesiones de la Convención Constituyente 2564 (1951). Además, "[faculta] el desarrollo pleno del individuo y [estimula] el libre intercambio y la diversidad de ideas, elementos vitales del proceso

democrático". <u>Velázquez Pagán v. A.M.A.</u>, 131 D.P.R. 568, 576 (1992).

"Entre las libertades individuales, la libertad de expresión es probablemente la más esencial, una vez garantizado el derecho a la vida y a la libertad física". <u>Asoc. de Maestros v. Srio. de Educación</u>, 156 D.P.R. 754, 767 (2002). "La libertad de expresión es la quintaesencia de una sociedad democrática. De forma multidimensional, en la constelación de valores democráticos, goza de una primacía peculiar". <u>Coss y U.P.R. v. C.E.E.</u>, 137 D.P.R. 877, 886 (1995). Como resultado, este Tribunal está llamado a la más celosa protección de un derecho tan cardinal. <u>Asoc. de Maestros v. Srio. de Educación</u>, <u>supra</u>, pág. 768.

Sin embargo, hemos reiterado a la saciedad que el derecho a la libertad de palabra no está inmune a la imposición de limitaciones, siempre y cuando éstas sean interpretadas de forma restrictiva, de manera que no abarquen más de lo imprescindible. <u>Muñiz v. Admor. Deporte Hípico</u>, <u>supra</u>, pág. 24; Véanse también, <u>Asoc. de Maestros v. Srio. de Educación</u>, <u>supra</u>, págs. 768-769; <u>Velázquez Pagán v. A.M.A.</u>, <u>supra</u>, pág. 576; <u>Rodríguez v. Srio. de Instrucción</u>, <u>supra</u>, pág. 255. La libertad de expresión no es un derecho absoluto. Por consiguiente, puede "subordinarse a otros intereses cuando la necesidad y conveniencia públic[a] lo requieran". <u>Mari Bras v. Casañas</u>, 96 D.P.R. 15, 21 (1968). Véanse también: <u>Aponte</u>

Martínez v. Lugo, 100 D.P.R. 282, 290 (1971); A. Lewis, Freedom for the Thought that We Hate, New York, Ed. Basic Books, 2007, pág. 169 ("*People invoke the First Amendment as if those words would settle whatever issue was being debated. But in truth the freedoms of speech and of the press have never been absolutes*".).

La Sec. 4 de la Carta de Derechos local, supra, encuentra su origen en los postulados de la Primera Enmienda de la Constitución de Estados Unidos de América, Enmd. I, Const. EE. UU., L.P.R.A., Tomo 1. Véase, J. Trías Monge, Historia Constitucional de Puerto Rico, Ed. U.P.R., 1982, T. 3, pág. 181. La Primera Enmienda declara, en lo pertinente, que "[e]l Congreso no aprobará ninguna ley... que coarte la libertad de palabra o de prensa; o el derecho del pueblo a reunirse pacíficamente y a solicitar del Gobierno la reparación de agravios". Enmd. 1, supra. A su vez, la Enmienda Catorce, Const. EE. UU., L.P.R.A., Tomo 1, hizo extensivas las garantías a las libertades de expresión y prensa consagradas en la Primera Enmienda, supra, a todos los estados de la Unión. Véanse: Enmd. XIV, supra; J.E. Nowak & R.D. Rotunda, op. cit., pág. 1252. Por tratarse de un derecho fundamental, la garantía de libertad de expresión y prensa de la Constitución federal aplica en Puerto Rico. Balzac v. People of Porto Rico, 258 U.S. 298, 314 (1922); Aponte Martínez v. Lugo, 100 D.P.R. 282, 286-287 (1971). Véase, D. M. Helfeld, How Much of the Federal Constitution is

Likely to be Held Applicable to the Commonwealth of Puerto Rico, 39 Rev. Jur. U.P.R. 169, 183 (1969).

Por esa razón, "las garantías de nuestra Carta de Derechos las interpretamos y hacemos efectivas no en menor grado de protección que lo hace, respecto a garantías similares, el Tribunal Supremo de los Estados Unidos". Aponte Martínez v. Lugo, supra. Al resolver casos y controversias que surgen bajo el palio de la Primera Enmienda, supra, el Tribunal Supremo federal ha bifurcado su análisis en dos grandes categorías, a saber: (1) acciones gubernamentales que reglamentan el contenido de la expresión, y (2) aquéllas que regulan su tiempo, lugar y manera. J.E. Nowak & R.D. Rotunda, op. cit., pág. 1253; K. Sullivan & G. Gunther, First Amendment Law, New York, Ed. Foundation Press, 1999, pág. 193 ("The Court has increasingly treated the distinction between content-based and content-neutral regulations as a crucial one in First Amendment law".); R. Serrano Geyls, Derecho constitucional de Estados Unidos y Puerto Rico, op. cit., T. 2, pág. 1278.

**B.    La reglamentación gubernamental del contenido de la expresión.**

Al analizar las controversias que plantean el derecho a la libertad de expresión, hemos adoptado el sistema de análisis implantado por el más alto foro federal. Por consiguiente, hemos consignado que "es menester distinguir entre la reglamentación gubernamental del contenido de la expresión y la reglamentación del

tiempo, lugar y manera de la expresión". Muñiz v. Admor.
Deporte Hípico, supra, pág. 24; Véase, además, Asoc. de
Maestros v. Srio. de Educación, supra, pág. 769.

En términos generales, hemos desfavorecido toda
intervención gubernamental que procure impedir
determinada expresión debido a su contenido. Una
intervención gubernamental incide sobre el contenido de
una expresión si

> la prohibición va dirigida precisamente a las
> ideas o a la información que se quiere
> diseminar, por el mensaje o punto de vista
> específico de la expresión o por el efecto que
> esa información o idea pueda tener. Cualquier
> acción del Gobierno de esta naturaleza, que
> esté dirigida al contenido o al impacto
> comunicativo de la expresión, **se considera tan
> ominosa jurídicamente que se presume contraria
> a la Primera Enmienda de la Constitución
> federal**, [supra], **y a la Sec. 4 del Art. II de
> nuestra Constitución**... [supra] [Énfasis en el
> original.].
>
> Muñiz v. Admor. Deporte Hípico, supra, pág. 25,
> citando a L.H. Tribe, American Constitutional
> Law, 2da ed., New York, Ed. Foundation Press,
> 1988, Sec. 12-2, págs. 789-790.

Cuando una actuación gubernamental esté diseñada
para afectar el contenido de la expresión, deberá
someterse a un escrutinio judicial estricto. Lo anterior
implica que la restricción a la actividad expresiva no se
sostendrá, a no ser que el gobierno pueda justificar que
su acción está estrechamente diseñada para alcanzar un
interés público apremiante y que tal actuación es
necesaria para alcanzar dicho interés. Véase, Perry Ed.
Assn. v. Perry Local Educators' Assn., 460 U.S. 37, 45
(1983). Véanse, además, Pleasant Grove City v. Summum,

129 S. Ct. 1125, 1132 (2009), 555 U.S. ___ (2009); Frisby v. Schultz, 487 U.S. 474, 841 (1988); Bd. of Airport Comm'rs v. Jews for Jesus, 482 U.S. 569, 573 (1987); J.E. Nowak & R.D. Rotunda, op. cit., págs. 1253 y 1254.

El Tribunal Supremo federal ha permitido, en limitadas ocasiones y mediante una regulación clara y estrechamente diseñada, que se proscriba determinada expresión por causa de su contenido cuando ésta puede catalogarse bajo alguna de las siguientes clasificaciones:

> *(1) speech that incites to imminent lawless action, such as a speaker who urges the lynch mob to attack; (2) speech that triggers an automatic violent response (so called "fighting words" or "true threats"); (3) obscenity, (which the Court narrowly defines to exclude much material that the popular press often describes as pornography); (4) child pornography, a limited category of speech involving photographs and films of young children; (5) certain types of defamatory speech; and (6) certain types of commercial speech, primarily false or misleading speech connected to the sale of a service or product, or offers to engage in illegal activity, such as advertisement for a male-only employee when the law forbids sex discrimination.*

J.E. Nowak & R.D. Rotunda, op. cit., págs. 1253-1254.

Al igual que el Tribunal Supremo federal, también nos hemos expresado sobre esas clasificaciones, al autorizar determinadas actuaciones o regulaciones gubernamentales aunque incidan sobre el contenido del mensaje, ya que la expresión resulta ser: (1) subversiva; (2) difamatoria; (3) invasora de la intimidad; (4) obscena; o (5) de naturaleza comercial. Colón v. Romero

Barceló, 112 D.P.R. 573 (1982); Pueblo v. Olivero Rodríguez, 112 D.P.R. 369 (1982); Pueblo v. Burgos, 75 D.P.R. 51 (1953); Guadalupe v. Bravo, 71 D.P.R. 975 (1950); Véase, además, R. Serrano Geyls, op. cit., págs. 1279-1447.

No obstante, cuando una actuación gubernamental impide cierto mensaje por causa de su contenido y la expresión no está dentro de alguna de esas clasificaciones, el gobierno tendrá la carga onerosa de establecer que la limitación a la expresión cumple con los requisitos esenciales de un escrutinio judicial estricto; a saber, que está diseñada estrechamente para alcanzar un interés gubernamental apremiante. J.E. Nowak & R.D. Rotunda, op. cit., pág. 1254.

**C.   La reglamentación gubernamental del tiempo, lugar y la manera de la expresión, y el análisis tripartita de foros.**

El Estado no puede suprimir de manera total y absoluta el ejercicio de la expresión legítima. Tampoco se favorece, como regla general, la regulación del contenido de la expresión protegida. Ahora bien, el Estado sí puede limitar, bajo ciertas condiciones, el tiempo, lugar y la manera en que un ciudadano ejerce su derecho a la libre expresión. Véase, Perry Educ. Ass'n v. Perry Local Educators' Ass'n, supra, pág. 45. Véanse, además, Hill v. Colo., 530 U.S. 703, 726 n. 32 (2000); Burson v. Freeman, 504 U.S. 191, 197 (1992); J.E. Nowak & R.D. Rotunda, pág. 1255. Sin este tipo de límite o

restricción, nuestra sociedad democrática estaría desprovista de algún grado sensato de orden y civilidad, ya que los ciudadanos estarían libres para expresar su mensaje sin importar el contexto específico del lugar, el momento o el modo en que lo hacen. Id.

El Tribunal Supremo federal ha establecido que una regulación o actuación gubernamental que tan solo incida sobre el tiempo, lugar y la manera de la expresión, será válida únicamente si cumple con un escrutinio judicial intermedio. El escrutinio judicial intermedio requiere que la regulación o actuación gubernamental cumpla con tres exigencias: (1) que sea neutral en cuanto al contenido de la expresión; (2) que haya sido diseñada estrechamente para alcanzar un interés gubernamental importante o significativo que no esté relacionado con la supresión del contenido de la expresión; y (3) que no impida medios alternativos de comunicación. Burson v. Freeman, supra, pág. 197; Véanse, además, Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989); United States v. Grace, 461 U.S. 171, 177 (1983); J.E. Nowak & R.D. Rotunda, op. cit., págs. 1255 y 1257.

La utilización de un escrutinio judicial intermedio evita los rigores de un escrutinio judicial estricto. Este último exige que se pruebe un interés gubernamental apremiante e inclina el péndulo de intereses hacia el extremo de permitir todo tipo de expresión en cualquier sitio, ocasión o forma. En el otro extremo, revisar las

regulaciones o actuaciones gubernamentales a la luz de un escrutinio de razonabilidad mínima facultaría que el Estado suprima adversamente la libertad de expresión en nuestra sociedad, ya que se presumiría constitucional la acción impugnada y quien se opone a ella tendría la carga pesada de demostrar que el gobierno no persigue un interés gubernamental legítimo. Véase, J.E. Nowak & R.D. Rotunda,op.cit.

Cuando el Gobierno restringe el derecho a la libertad de expresión en propiedad pública, se desata una pugna de intereses entre el derecho del Estado a limitar el uso que se ejerce sobre ésta, y el derecho de todo ciudadano a utilizar la propiedad del Estado para actividades intrínsecas a la libertad de palabra. Bd. of Airport Comm'rs v. Jews for Jesus, supra, pág. 572. Para alcanzar un balance de intereses, el Tribunal Supremo federal ha instaurado un análisis tripartita, en donde el grado de expresión permitido dependerá del tipo de foro identificado. Según el caso normativo Perry Educ. Ass'n v. Perry Local Educators' Ass'n, supra, págs. 45-46, los tres foros de expresión son: (1) el foro público tradicional; (2) el foro público por designación, y (3) el foro público no tradicional. Véanse, además, Ark. Educ. TV Comm'n v. Forbes, 523 U.S. 666, 677 (1998); Cornelius v. NAACP Legal Defense & Ed. Fund, Inc., 473 U.S. 788, 802 (1985).

Un foro público tradicional es un lugar que por uso y costumbre o por fíat gubernamental ha sido destinado a la reunión pacífica y al debate público. Perry Educ. Ass'n v. Perry Local Educators' Ass'n, supra, pág. 45. Las calles, aceras y parques son lugares que por excelencia se han considerado foros públicos tradicionales, ya que por tiempo inmemorable han sido reservados para el uso del pueblo y para la reunión entre ciudadanos con el fin de cultivar la comunicación y discutir asuntos de interés social. Id., citando a Hague v. CIO, 307 U.S. 496, 515 (1939) ("*Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.*").

Al analizar toda regulación o limitación de la libertad de palabra en este tipo de foro, los tribunales deben emplear el análisis dual antes esbozado, examinando si la acción interfiere con el contenido de la expresión o si sólo coarta el tiempo, lugar o la manera de hacerla. Si la regulación o limitación suprime el contenido de la expresión en un foro público tradicional, los tribunales aplicarán el escrutinio judicial estricto antes explicado, a no ser que se trate de alguna de las clasificaciones de expresión que han sido proscritas por su contenido (i.e., obscenidad); empero, si la

restricción solo atañe el tiempo, lugar y el modo de la expresión, entonces será de aplicación el escrutinio judicial intermedio antes consignado. Éste aplica a toda regulación que sea neutral hacia el contenido de la expresión. Perry Educ. Ass'n v. Perry Local Educators' Ass'n, supra, págs. 45-46. Véase, también, Pleasant Grove City v. Summum, supra, pág. 1132.

La segunda clase de foro, el foro público por designación, consiste en aquella propiedad pública que el Estado ha abierto a la actividad expresiva. Perry Educ. Ass'n v. Perry Local Educators' Ass'n, supra, pág. 45. El foro público por designación no es uno originalmente destinado a gestiones comunicativas, pero el Gobierno, por elección propia, opta por abrirlo para tales propósitos. Pleasant Grove City v. Summum, supra, pág. 1132. Véase, también, Cornelius v. NAACP Legal Defense & Ed. Fund, Inc., supra, pág. 802. Aunque el Estado no está obligado a proveer para fines expresivos la propiedad pública que no es catalogada tradicionalmente como un foro público, mientras lo haga deberá cumplir con el escrutinio empleado para evaluar la constitucionalidad de la regulación de la expresión protegida en los foros públicos tradicionales. Perry Educ. Ass'n v. Perry Local Educators' Ass'n, supra, pág. 46. En U.N.T.S. v. Srio. de Salud, 133 D.P.R. 153, 164 (1993), añadimos:

> Dentro de esta categoría, el Gobierno puede
> designar foros públicos limitados. Éstos se
> abren para propósitos específicos, tales como
> la discusión e intercambio de ideas por ciertos

grupos o sobre ciertos temas. Por lo tanto, en esos casos, el derecho a expresarse se extendería sólo a otros grupos de carácter similar o a otros puntos de vista sobre el mismo tema. El Gobierno no puede crear estos foros por inacción, sino sólo deliberadamente [Citas omitidas.].

Por último, el foro público no tradicional alberga aquella propiedad pública que no ha sido destinada tradicionalmente a la reunión pacífica o al debate público y el Gobierno tampoco ha elegido abrirla para actividades expresivas. J.E. Nowak & R.D. Rotunda, op. cit., pág. 1263. La categoría de foro público no tradicional se examina a la luz de un escrutinio judicial distinto al establecido para el foro público tradicional y el foro público por designación. En el foro público no tradicional,

la protección que ofrece la Primera Enmienda de la Constitución federal es menor. El Gobierno puede limitar la actividad expresiva a aquella que sea compatible con el objetivo para el cual fue creada esta propiedad pública. La reglamentación de la expresión será válida siempre que sea razonable, aunque no tiene que ser la única ni la más razonable (International Soc'y for Krishna Conciousness, Inc. v. Lee, supra; Cornelius v. NAACP Legal Defense & Ed. Fund., supra, pág. 808), neutral en cuanto a puntos de vista (Cornelius v. NAACP Legal Defense & Ed. Fund., supra, pág. 806), y siempre que no sea parte de un esfuerzo por suprimir la expresión (Perry Ed. Assn. v. Perry Local Educators' Assn., supra, pág. 46).

U.N.T.S. v. Srio. de Salud, supra, pág. 164.

**D. La libertad de expresión en el contexto universitario.**

Las instituciones universitarias han ocupado un papel protagónico en múltiples controversias jurídicas

respecto a los límites y contornos del derecho a la libertad de palabra. Al respecto, la jurisprudencia federal y local ha atendido los intereses en pugna. Por un lado, identificamos el interés de los estudiantes en ejercer el derecho que sin duda les asiste a la libre expresión, sin restricciones onerosas; mientras, por otra parte, la administración universitaria tiene el deber de asegurar el libre ejercicio de esa expresión dentro de los límites razonables que son compatibles con la misión de la Universidad que la administración tiene que promover y proteger. En otras palabras, la administración universitaria tiene que asegurarle al país y a los componentes del campus que la universidad pública cumplirá su misión docente como centro de formación, instrucción y aprendizaje.

El máximo foro federal dictaminó en _Tinker v. Des Moines Indep. Cmty. Sch. Dist._, 393 U.S. 503, 505 (1969), que el derecho a la libertad de expresión de estudiantes de escuelas secundarias no podía limitarse absolutamente, a no ser que el Estado demostrara que el ejercicio de expresión estudiantil afectaba material y sustancialmente el ambiente de aprendizaje de la escuela y el orden y la disciplina en la institución. Según el Tribunal Supremo, los actos expresivos de los estudiantes —protestar contra el conflicto bélico en Vietnam mediante el uso en la escuela de bandas negras en sus brazos— estaban cobijados por la Primera Enmienda, _supra_, ya que los maestros y los

estudiantes no pierden sus derechos constitucionales una vez traspasan los portones escolares hacia las aulas de estudio. Íd., pág. 506.

En Rodríguez v. Srio. de Instrucción, supra, adoptamos los pronunciamientos del Tribunal Supremo federal en Tinker v. Des Moines Indep. Cmty. Sch. Dist., supra. "Los derechos básicos garantizados por nuestra Constitución acompañan tanto a maestros como a estudiantes durante su permanencia en los predios escolares. La prohibición de su ejercicio tiene pues que obedecer a motivos que trasciendan del mero deseo de evitar inconvenientes triviales". Rodríguez v. Srio. de Instrucción, supra, págs. 257-258.

Además, en Sánchez Carambot v. Dir. Col. Univ. Humacao, 113 D.P.R. 153, 160 (1982), integramos a la esfera universitaria los principios esbozados en Rodríguez v. Srio. de Instrucción, supra. Expresamos que

> es afín con la esencia vital de la universidad la norma constitucional que reconocimos en Rodríguez v. Srio. de Instrucción, [supra], a los efectos de que estudiantes y profesores conservan sus derechos de expresión y asociación pacífica en consonancia con los propósitos de la institución, cuando entran a los centros de enseñanza.

> Sánchez Carambot v. Dir. Col. Univ. Humacao, supra, pág. 162.

No obstante, el criterio de las autoridades escolares merece deferencia, para garantizar así que el derecho a la libertad de expresión no interfiera sustancialmente con el ambiente de enseñanza y

aprendizaje académico. Así, en Bethel School Dist. No. 403 v. Fraser, 478 U.S. 675 (1986), el Tribunal Supremo federal determinó que los administradores de una escuela pueden suspender a un estudiante que emitió un discurso sexualmente cargado en una asamblea de estudiantes, ya que las escuelas tienen autoridad para determinar qué constituye lenguaje sexualmente indecente y ofensivo, el cual no está protegido por la Primera Enmienda, supra. En Hazelwood School Dist. v. Kuhlmeir, 484 U.S. 260 (1988), se estableció que una escuela puede ejercer control editorial sobre el contenido de expresiones estudiantiles en foros auspiciados por la escuela, sin tener que probar que la expresión estudiantil interrumpe sustancialmente las labores académicas. Sin embargo, la limitación debe estar razonablemente relacionada con algún interés pedagógico legítimo. Finalmente, en Morse v. Frederick, 551 U.S. 393 (2007), se determinó que una escuela puede suspender a un estudiante por desplegar un letrero que leía "*BONG HITS 4 JESUS*" en una actividad escolar.

Recientemente, el Tribunal Supremo federal extrapoló al entorno universitario lo dicho en el contexto escolar, y reafirmó que los tribunales le debemos deferencia al juicio de las administraciones universitarias con relación a qué política interna faculta el alcance de los objetivos y fines pedagógicos que son característicos de un centro de alta enseñanza. Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martínez, 130 S. Ct.

2971, ___ U.S. ___ (2010). En concreto, el Tribunal aseveró lo siguiente:

> *This Court is the final arbiter of the question whether a public university has exceeded constitutional constraints, and we owe no deference to universities when we consider that question.... Cognizant that judges lack the on-the-ground expertise and experience of school administrators, however, we have cautioned courts in various contexts to resist substituting their own notions of sound educational policy for those of the school authorities which they review.*

Id., pág. 2988.

En fin, el derecho a la libertad de expresión de estudiantes, empleados y profesores debe ser cónsono con la misión educativa de la universidad. Sin embargo, la administración universitaria no tiene un poder irrestricto para limitar el derecho a la libertad de palabra so pretexto de alcanzar sus objetivos pedagógicos. Hemos requerido que "las autoridades [universitarias] muestren los hechos que razonablemente las han llevado a concluir que de permitir la actividad proscrita, se alterarían substancialmente o se causaría una seria intervención con las actividades docentes". Rodríguez v. Srio. de Instrucción, supra, pág. 257. Las autoridades universitarias deben demostrar que "las restricciones impuestas obedecen a la necesidad real de defender la eficiencia e integridad del servicio público". Id., págs. 257-258. Véase, además, Sánchez Carambot v. Dir. Col. Univ. Humacao, supra, pág. 162.

La pugna de intereses reseñada se ha desatado frecuentemente en el contexto de un recinto universitario público. Como tal, la jurisprudencia local y federal ha atendido esas controversias según los confines de la doctrina tripartita de los foros públicos establecida en *Perry Education Assn. v. Perry Local Educator's Assn.*, *supra*. En la esfera federal ya se ha resuelto que un recinto universitario manifiesta muchas de las características inherentes a un foro público; sin embargo, por sus objetivos pedagógicos y académicos, no puede compararse a los foros públicos tradicionales. Así, en *Widmar v. Vincent*, 454 U.S. 263, 268 n. 5 (1981), se expresó:

> *[T]he campus of a public university, at least for its students, possesses many of the characteristics of a public forum. See generally Police Dept. of Chicago v. Mosley, 408 U.S. 92 (1972); Cox v. Louisiana, 379 U.S. 536 (1965). 'The college classroom with its surrounding environs is peculiarly the marketplace of ideas.' Healy v. James, 408 U.S. 169, 180 (1972).... We therefore have held that students enjoy First Amendment rights of speech and association on the campus. At the same time, however, our cases have recognized that First Amendment rights must be analyzed 'in light of the special characteristics of the school environment'. Tinker v. Des Moines Independent School District, [supra, pág. 506]. We continue to adhere to that view. A university differs in significant respects from public forums such as streets or parks or even municipal theaters. A university's mission is education, and decisions of this Court have never denied a university's authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities.*

En la esfera local, ya hemos articulado que "las facilidades educativas podrían considerarse foros públicos, sólo si las autoridades escolares –'mediante política o por práctica'– han abierto esas facilidades 'para el uso indiscriminado del público en general'". Coss y U.P.R. v. C.E.E., supra, pág. 889, citando a Perry Education Assn. v. Perry Local Educator's Assn., supra, pág. 47. En ese caso resolvimos que el periódico Diálogo de la Universidad de Puerto Rico es un foro público por designación.

Queda claro, entonces, que tanto en la jurisdicción federal como en la local, los recintos universitarios no se catalogan como foros públicos tradicionales. La tendencia ha sido catalogar los recintos universitarios y las escuelas como foros públicos por designación (también conocidos como foros semipúblicos) si las prácticas o políticas de la institución conceden espacio para actividades expresivas. En Rodríguez v. Srio. de Instrucción, supra, pág. 257, concluimos que las escuelas son foros semipúblicos donde "el Estado disfruta del derecho de mantener la tranquilidad requerida para llevar a cabo el principal cometido asignádole; [pero],... carece de facultad para excluir de dichas instituciones la expresión o asociación pacífica que sea compatible con su gestión". Véanse, además, Rosenberger v. Rector and Visitors of Univ. of Va., 515 U.S. 819 (1995)(al crear un fondo que subsidiaba publicaciones estudiantiles, la

Universidad de Virginia creó un foro público limitado); Hays County Guardian v. Supple, 969 F.2d 111 (5to Cir. 1992) (un recinto universitario es un foro público limitado por tener reglamentación y políticas internas que reconocen el derecho a la libertad de expresión de los estudiantes y por permitir la distribución en todo el recinto del periódico de la universidad); Grace Bible Fellowship, Inc. v. Maine School Administrative Dist. No. 5, 941 F.2d 45 (1er Cir. 1991). (al rentar las facilidades escolares a un número amplio de grupos de la comunidad, la escuela creó un foro público por designación). En fin, establecer qué tipo de foro es determinada facilidad educativa, o algún componente de ella, es un ejercicio que debe tomar en cuenta las características especiales de cada institución de enseñanza, al igual que las particularidades del caso y la controversia ante la consideración del tribunal.

V

**A.    La misión de la Universidad de Puerto Rico.**

Es incuestionable que la Universidad de Puerto Rico es una institución vital y de suma importancia para el pleno desarrollo de nuestro sistema educativo y la prosperidad del territorio. Tan es así que la propia Ley de la Universidad de Puerto Rico, Ley Núm. 1 de 20 de enero de 1966, 18 L.P.R.A. sec. 601 *et seq.*, dispone en el Art. 2, 18 L.P.R.A. sec. 601:

§ 601. Objetivos

(a) La Universidad, como órgano de la educación superior, por su obligación de servicio al pueblo de Puerto Rico y por su debida fidelidad a los ideales de una sociedad integralmente democrática, tiene como misión esencial alcanzar los siguientes objetivos, con los cuales es consustancial la más amplia libertad de cátedra y de investigación científica:

(1) Transmitir e incrementar el saber por medio de las ciencias y de las artes, poniéndolo al servicio de la comunidad a través de la acción de sus profesores, investigadores, estudiantes y egresados.

(2) Contribuir al cultivo y disfrute de los valores éticos y estéticos de la cultura.

(b) En el cumplimiento leal de su misión, la Universidad deberá:

(1) Cultivar el amor al conocimiento como vía de libertad a través de la búsqueda y discusión de la verdad, en actitud de respeto al diálogo creador.

(2) Conservar, enriquecer y difundir los valores culturales del pueblo puertorriqueño y fortalecer la conciencia de su unidad en la común empresa de resolver democráticamente sus problemas.

(3) Procurar la formación plena del estudiante, en vista a su responsabilidad como servidor de la comunidad.

(4) Desarrollar a plenitud la riqueza intelectual y espiritual latente en nuestro pueblo, a fin de que los valores de la inteligencia y del espíritu de las personalidades excepcionales que surgen de todos sus sectores sociales, especialmente los menos favorecidos en recursos económicos, puedan ponerse al servicio de la sociedad puertorriqueña.

(5) Colaborar con otros organismos, dentro de las esferas de acción que le son propias, en el estudio de los problemas de Puerto Rico.

(6) Tener presente que por su carácter de Universidad y por su identificación con los

ideales de vida de Puerto Rico, ella está esencialmente vinculada a los valores e intereses de toda comunidad democrática.

Es claro que la Universidad de Puerto Rico no es cualquier institución gubernamental. Esta institución centenaria tiene un valor incalculable. Como expresamente dispone su ley, tiene la misión esencial e ineludible de transmitir e incrementar el saber por medio de las artes, las ciencias, la cultura y, a su vez, ponerlo al servicio de Puerto Rico. Cónsono con la búsqueda del cumplimiento cabal de su misión, la ley promueve que la Universidad de Puerto Rico sea un lugar donde se cultive el conocimiento, la cultura, el servicio y el estudio, entre otros deberes meritorios, y donde se practiquen los más altos valores de nuestro sistema democrático. Véanse, Consejo Educación Superior v. U.I.A., 120 D.P.R. 224 (1985); C.E.S. U.P.R. v. Gobernador, 137 D.P.R. 70 (1994) (Sentencia). En fin, la Universidad de Puerto Rico está esencialmente vinculada a los valores e intereses de toda la comunidad democrática. García Cabán v. U.P.R., 120 D.P.R. 167, 180 (1987).

De esta forma, la Universidad debe procurar la formación plena de los estudiantes, quienes son parte fundamental de la comunidad universitaria. De igual forma, la Universidad se nutre de los profesores, la libertad académica y de las investigaciones que la hacen ser una institución capaz de impartir grandes conocimientos a la sociedad. Por ende, las funciones de

libertad académica y estudio que dicha institución ejerce gozan de nuestro aprecio jurídico. Sánchez Carambot v. Dir. Col. Univ. Humacao, supra, pág. 160.

**B.    La U.P.R. es un foro semipúblico.**

Al examinar los escritos de ambas partes, encontramos que el interdicto permanente solicitado por la Universidad de Puerto Rico es una actuación gubernamental que incide sobre el tiempo, lugar y la manera de la expresión. Por eso, está sujeto al escrutinio constitucional aplicable a un foro limitado por designación o semipúblico, como lo es el Recinto de Río Piedras de la Universidad de Puerto Rico.

La naturaleza del campus universitario como foro limitado por designación surge de la ley. En el Art. 2 de la Ley Universitaria, supra, el legislador estableció como misión de la Universidad el desarrollo y el servicio a la comunidad puertorriqueña mediante la aportación de sus recursos académicos, intelectuales, investigativos y culturales. Como resultado, la Universidad de Puerto Rico ha cumplido su misión al proveer acceso al pueblo puertorriqueño a un caudal único de bibliotecas, teatros, museos, facilidades deportivas, investigaciones de vanguardia, profesores y estudiantes capacitados, actividades culturales, y otros recursos, los cuales han adelantado el mejoramiento cultural e intelectual de nuestra sociedad democrática. Véase, Roberto Roldán Burgos, La doctrina de foro público y la Universidad de

Puerto Rico: inconstitucionalidad de las prohibiciones de entrada, 56 Rev. Jur. U.P.R. 1, 24-27 (1987). En fin, la U.P.R. ha abierto sus facilidades para el uso indiscriminado del público en general.

Ahora bien, esa apertura no fue irrestricta. La apertura de la U.P.R. al público en general se hace para adelantar una misión cultural, social y educativa. Cualquier expresión en el campus universitario tiene que ubicarse dentro de ese contexto y no puede derrotar el fin último de la vida universitaria: forjar los estudiantes que asisten al centro de alta docencia.

> Demás está decir que hay lugares que resultan impropios para ejercitar algunos modos de expresión. Los tribunales, los hospitales, los templos y las escuelas son algunos de esos sitios. Así reconocimos en E.L.A. v. Hermandad de Empleados, 104 D.P.R. 436, 443-444 (1975), al adoptar expresiones del Juez Hugo L. Black en Gregory v. City of Chicago, 394 U.S. 111 (1964), que nada impide al Estado mantener las escuelas y otros lugares similares libres del bullicio propio de la política y de los negocios, protegiendo así el sosiego que en ellas debe prevalecer. En contraste con los parques, plazas y calles, considerados tradicionalmente foros por excelencia de expresión pública, las escuelas y bibliotecas estatales no se organizaron para celebrar en ellas libre intercambio comunitario. Tienen pues la naturaleza de foros semipúblicos. En instituciones de esa índole el Estado disfruta del derecho de mantener la tranquilidad requerida para llevar a cabo el principal cometido asignádole. Pero, por otro lado, como bien señala el Profesor Tribe, el Estado carece de facultad para excluir de dichas instituciones la expresión o asociación pacífica que sea compatible con su gestión.
>
> Rodríguez v. Srio. de Instrucción, supra, págs. 256-257 (escolios y cita omitida).

Como foro semipúblico por designación, toda limitación a la garantía constitucional de libertad de palabra dentro de la Universidad de Puerto Rico deberá someterse al escrutinio constitucional adecuado para determinar si la restricción gubernamental incide sobre el contenido de la expresión o si solo afecta el tiempo, lugar y la manera de manifestarse. Conceptualmente, el remedio de interdicto permanente que solicita la administración universitaria no incide sobre el contenido de la expresión estudiantil, ya que la prohibición no va dirigida a las ideas o a la información que los estudiantes quieren diseminar y tampoco atenta contra el mensaje o punto de vista específico de la expresión. Por esa razón, no es de aplicación un escrutinio judicial estricto como alegan los estudiantes recurridos. Sin embargo, el interdicto permanente sí tendrá efectos sobre el tiempo, lugar y la manera de la expresión.

Por tanto, el remedio de interdicto que pondere el Tribunal de Primera Instancia en estos casos, deberá cumplir con un escrutinio intermedio. Primero, de concederse, el interdicto debe ser neutral en cuanto al contenido de la expresión y no debe prohibir absolutamente que los estudiantes expresen sus puntos de vista, siempre y cuando lo hagan por canales que no atenten contra el fin último de la universidad, entiéndase, la enseñanza. Segundo, el interdicto deberá estar estrechamente diseñado para impedir que se

obstaculice la entrada y salida del campus y procurar alcanzar el interés gubernamental significativo de garantizar el orden y la disciplina en el foro universitario; lograr un ambiente académico que cumpla con el fin educativo de la institución universitaria; proteger el derecho a estudiar de los estudiantes que deseen hacerlo; permitir que el pueblo tenga acceso al cúmulo de recursos que provee la Universidad de Puerto Rico; y procurar la integridad y eficiencia institucional del primer centro docente de Puerto Rico. Finalmente, el interdicto solicitado no debe impedir medios alternos de comunicación. Como resultado, los estudiantes deben poder valerse de múltiples vías alternas de comunicación, a saber: manifestaciones, marchas, pancartas, expresiones simbólicas y el uso de la tecnología, entre otros medios legítimos, siempre y cuando sus actos no interrumpan el flujo normal de las clases ni atenten contra los derechos de otros individuos dentro de la comunidad universitaria.

Amerita recordar que el remedio del interdicto representa un riesgo mayor de censura y aplicación discriminatoria en comparación con una legislación o regulación que haga lo propio. Ello se debe a que la aplicación del *injunction* es de naturaleza particular a las partes en un pleito y porque no ha sido filtrado por el proceso deliberativo inherente al foro legislativo. Como tal, los tribunales deberán diseñar interdictos que no constituyan una limitación a la actividad expresiva

más allá de lo necesario para alcanzar el interés significativo perseguido por el Estado.

En último lugar, en este caso no cabe hablar de censura previa. El *injunction* permanente no busca restringir que los estudiantes se expresen en su totalidad, sino que solo prohíbe el acto de impedir la entrada al campus universitario e interrumpir la actividad docente. Véase, Madsen v. Women's Health Ctr., supra, pág. 764 n.2. Los estudiantes cuentan con otros medios alternos para expresar su mensaje. El interdicto solo incide sobre el tiempo, lugar y la manera de la expresión y no sobre el contenido de ésta.

No hay duda de que los estudiantes de la Universidad de Puerto Rico no pierden su derecho constitucional a la libre expresión una vez traspasan los portones universitarios. Así lo reconoce el Reglamento General de Estudiantes de la Universidad de Puerto Rico, cuando establece que "[e]l estudiante tendrá derecho a expresarse, asociarse, reunirse libremente, formular peticiones y llevar a cabo actividades igual que cualquier otra persona en Puerto Rico y sujeto a las disposiciones de ley y de reglamentación universitaria aplicables". Art. 2.15, Reglamento General de Estudiantes, Reglamento Núm. 7733, Departamento de Estado, 9 de septiembre de 2009.

Es imprescindible reconocer que el derecho a la libertad de palabra de los estudiantes aporta a nuestra

sociedad democrática una "crítica ilustrada, acuciosa y constante". Sanchez Carambot v. Dir. Col. Univ. Humacao, supra, pág. 161. Sin la garantía constitucional de la libertad de expresión, los estudiantes no alcanzarían "esa discusión enérgica de las ideas, que es tan esencial para el cabal desarrollo del hombre, como para la conservación y el sostenimiento del bienestar común en una sociedad que viva en democracia". Id., pág. 161.

Sin embargo, ese derecho a la libertad de palabra y asociación no es absoluto. Como ya indicamos, esa garantía cardinal queda restringida por el interés del Estado en velar por el orden, la civilidad y la disciplina dentro del recinto universitario, para así encaminar a la Universidad de Puerto Rico a alcanzar sus objetivos docentes y académicos. Cuando el ejercicio de expresión de los estudiantes afecta material o sustancialmente el ambiente de aprendizaje, el orden y la disciplina de la institución, será imprescindible limitar la actividad expresiva para que ésta sea cónsona con los propósitos pedagógicos del recinto académico.

**C. La "huelga estudiantil": definición y límites. Alcance del derecho constitucional de los estudiantes a protestar o a abstenerse de hacerlo.**

Los estudiantes recurridos reclaman para sí el derecho a protestar contra la administración de la U.P.R. mediante una "huelga estudiantil". Reclaman también que el último de esos incidentes culminó este año mediante un acuerdo que hace académico este pleito. Ya hemos

explicado por qué el caso no es académico. La posibilidad de que los recurridos u otros en común acuerdo con ellos lancen otra "huelga de estudiantes" sigue latente. Es contra esa conducta anunciada mediante un "voto preventivo de huelga estudiantil" que la U.P.R. solicita una orden judicial. Por esa razón, es menester analizar los derechos de los estudiantes al respecto, para asegurar que cualquier *injunction* que la prueba justifique no limite impermisiblemente los derechos de expresión y asociación de los estudiantes.

En su acepción más amplia, la huelga es una "alteración en el trabajo, de carácter colectivo, decidida por los trabajadores o sus representantes y llevada a cabo por éstos con el fin de presionar para el logro de determinados objetivos". C. Molero Manglano, Lecciones sobre convenios colectivos, derecho de huelga y cierre patronal, Madrid, Librería ICAI, 1988, pág. 99. Consiste pues, en la cesación del trabajo o de los servicios prestados por los trabajadores en defensa de sus intereses. Véase, I. Álvarez Sacristan, Diccionario jurídico-laboral, 1ra ed., Madrid, Ed. Civitas, S.A., 1988, pág. 138. En ese tenor, estar en huelga significa, sustancialmente, abstenerse del trabajo. Véase además, M. Alonso García, F. Almendros Morcillo, F. Pérez Amorós, E. Rojo Torrecilla, La huelga y el cierre empresarial, Madrid, Pub. Instituto de Estudios Económicos, 1979, pág. 27.

En otras palabras, la huelga es una acción concertada de un grupo de empleados que se efectúa con el propósito de interrumpir, paralizar o detener las labores y servicios del negocio operado por el patrono, para mejorar las condiciones de vida de los trabajadores. Véanse: Acevedo Colom, Legislación de Relaciones del Trabajo Comentada, 1ra ed., San Juan, Albaleco, Inc., 2007, pág. 446; O. Rojas Lugo, El Desarrollo del Derecho Laboral en Puerto Rico e Iberoamérica y su Interelación con el Desarrollo Político, Hato Rey, P.R., Ramallo Bros. Printing, 1997, pág. 222.

Como se puede apreciar, la definición del concepto huelga esté asociada a los trabajadores. De hecho, la etimología de la palabra huelga en el idioma francés proviene de la palabra greve. Esa palabra, a su vez, alude al nombre de la plaza del Ayuntamiento de París, conocida como "Plaza de Greve" o plaza de la huelga. G. Cabanellas, Tratado de derecho laboral; derecho colectivo laboral, Argentina, El Gráfico Impresores, 1949, T. III, pág. 560. Esta plaza era un terreno sin construcciones donde los obreros que estaban desempleados se reunían en espera de que llegaran los empresarios a tratar con ellos y a contratarlos. Id. "Cuando los obreros estaban descontentos de las condiciones de trabajo se colocaban en huelga (greve), lo cual quiere decir, literalmente, en la Plaza de Greve, a la espera de mejores propuestas". Id. Igual acercamiento a los obreros tiene la palabra

huelga en el idioma castellano. Ésta procede de *huelgo*, que significa espacio de tiempo que uno está sin trabajar. Id.

Desde el punto de vista jurídico, la huelga se manifiesta como el derecho que "posee legítimamente todo aquel trabajador que presta servicios a su patrono". Rojas Lugo, op. cit., pág. 219, 222. Adquiere su calidad de derecho cuando determinado ordenamiento jurídico así lo reconoce. Véase, Alonso García y otros, op. cit., pág. 41. En Puerto Rico, la huelga ha sido elevada a rango constitucional. Art. II, Sec. 18 de la Constitución de Puerto Rico.

En concreto, se trata de un derecho atribuido a los trabajadores. Álvarez Sacristan, op. cit., pág. 138. Por eso, ya sea a nivel individual o colectivo, "la atribución del poder que el derecho de huelga confiere pertenece al trabajador". Alonso García y otros, op. cit., pág. 46.

> Las huelgas se producen como consecuencia del nacimiento de la gran industria, ante el enorme desarrollo económico que ponía grandes riquezas en pocas manos, por el proceso de concentración del industrialismo moderno, a causa de la necesidad de mejores medios de vida para los trabajadores, por efecto del espíritu de asociación y de las nuevas ideas que impusieron una distinta concepción del Derecho y una más amplia libertad de trabajo.

G. Cabanellas, op. cit., págs. 563-564.

Es ostensible que la huelga es un derecho concebido para los trabajadores, para asegurar su derecho a

organizarse y a negociar colectivamente. Así lo hemos reconocido al expresar que "[e]l derecho de huelga es un instrumento eficaz que nuestra Constitución ha puesto a disposición **de los trabajadores y de sus uniones** para procurarse mejores condiciones de trabajo y para lograr un más alto nivel de vida cuando el patrono se niega a acceder a sus demandas". Agostini v. Tribunal Superior, 82 D.P.R. 219, 232 (1961) (énfasis suplido). De igual forma, la Comisión de Carta de Derechos, en su informe a la Convención Constituyente, juzgó propio "salvaguardar el derecho a la huelga en forma explícita como supremo recurso final en la reclamación del **derecho obrero**". 4 Diario de Sesiones de la Convención Constituyente 2575 (énfasis suplido). Véase, además, U.T.I.E.R. v. J.R.T., 99 D.P.R. 512, 524 (1970).

Por eso, aparte del reconocimiento de ese derecho que hace nuestra Constitución y los estatutos laborales remediales, no existe ninguna otra disposición en nuestra jurisdicción que extienda la titularidad de ese derecho a otro grupo de personas o sector de la población.

La Junta Nacional de Relaciones del Trabajo ha rechazado la existencia de un derecho a huelga de los estudiantes, al interpretar la Ley Nacional de Relaciones del Trabajo, 29 U.S.C.A. sec. 153(d). En Cedars-Sinai Med. Ctr. & Cedars-Sinai Housestaff Ass'n, 223 N.L.R.B. 251 (1976) y en St. Clare's Hospital and Health Center, 229 N.L.R.B. 1000 (1977), la Junta Nacional resolvió que

los residentes, internos y asociados de una institución

de salud no eran empleados según la definición de la Ley

Nacional de Relaciones del Trabajo, porque eran

estudiantes.[6] Por lo tanto, no se les reconoció el derecho

a unionarse y a irse a la huelga. Véase, J. Freedley

Hundsicker, Significant Labor and Employment Law Issues

in Higher Education During the Past Decade and What to

Look for Now: A Management Perspective, 29 J.L. & Educ.

343, 348-349 (2000). De hecho, cuando posteriormente la

Junta Nacional resolvió que los residentes, internos y

asociados de otra institución de salud eran empleados, lo

hizo bajo el razonamiento de que éstos cobraban un

salario y otros beneficios, por lo que no podía

calificárseles como meros estudiantes. Boston Med. Ctr.

---

[6] La Sec. 2(3) de la Ley Nacional de Relaciones del
Trabajo, 29 U.S.C.A. sec. 152(3), dispone:

> *"The term "employee" shall include any
> employee, and shall not be limited to the
> employees of a particular employer, unless this
> subchapter explicitly states otherwise, and
> shall include any individual whose work has
> ceased as a consequence of, or in connection
> with, any current labor dispute or because of
> any unfair labor practice, and who has not
> obtained any other regular and substantially
> equivalent employment, but shall not include
> any individual employed as an agricultural
> laborer, or in the domestic service of any
> family or person at his home, or any individual
> employed by his parent or spouse, or any
> individual having the status of an independent
> contractor, or any individual employed as a
> supervisor, or any individual employed by an
> employer subject to the Railway Labor Act [45
> U.S.C.A. sec. 151 et seq], as amended from time
> to time, or by any other person who is not an
> employer as herein defined".*

Corp., 330 N.L.R.B. 152 (1999). Es decir, para reconocerles derechos bajo las leyes laborales había que catalogarles como empleados en lugar de cómo estudiantes.

Aquí no está en controversia el hecho de que los recurridos eran estudiantes de la Universidad de Puerto Rico durante el tiempo que duró el "paro" en esa institución. Con independencia de si algunos formaban parte del Consejo General de Estudiantes y del Comité Negociador creado por aquel, o solamente eran líderes o participantes del movimiento que auspició y realizó la "huelga" en la universidad, es indubitado que todos eran estudiantes. Por ende, no podían ser titulares del derecho de huelga que se reconoce en la Constitución y las leyes laborales.

Tampoco existe en ningún reglamento de la Universidad de Puerto Rico disposición alguna que les reconozca a los estudiantes el derecho a huelga. La verdad es que no nos sorprende que este derecho se le haya reservado únicamente a los trabajadores en su relación obrero-patronal. Es que no estamos hablando de cualquier derecho. A pesar de su innegable utilidad, la huelga es un recurso poderoso a utilizarse con mesura. La propia Comisión de Carta de Derechos lo describió en su informe a la Convención Constituyente como: "un medio costoso e ingrato de resolver conflictos". 4 Diario de Sesiones de la Convención Constituyente 2575. También se le ha llamado "un estado de guerra...". G. Cabanellas,

op. cit., pág. 565. Asimismo, se ha señalado que el exceso del derecho de huelga y la posición intransigente de las partes en conflicto, crean, con las huelgas, un peligroso mal social. Id., pág. 267. Incluso, se ha afirmado que las huelgas son manifestaciones socialmente antipáticas porque sus efectos trascienden la relación de las partes en conflicto y afectan al público en general. Véase, N.W. Chamberlain, J. Metzger Schilling, The Impact of Strikes: Their Social and Economic Costs, Conn., Greenwood Press, Pub., 1954, pág.8.

Los estudiantes son miembros de la comunidad académica de la Universidad de Puerto Rico. Art. 10 de la Ley Núm. 1, supra, 18 L.P.R.A. sec. 609. Como tal, están representados oficialmente en cada recinto por el Consejo General de Estudiantes y por el Consejo de Estudiantes de Facultades. Id. Tanto el Consejo General como el Consejo de Estudiantes de Facultades son estructuras creadas por la Ley de la Universidad de Puerto Rico para garantizar la participación estudiantil en la estructura administrativa de la U.P.R.

El Consejo General de Estudiantes representa a todos los estudiantes de una unidad institucional y está constituido por un Presidente, por los representantes estudiantiles a la Junta Administrativa y la Junta Universitaria, los Senadores Estudiantiles electos, así como uno o más miembros adicionales de la directiva de cada Consejo de Estudiantes. Art. 3.2 del Reglamento

General de Estudiantes de la Universidad de Puerto Rico,
Reglamento Núm. 7733, Departamento de Estado, 9 de
septiembre de 2009. Por su parte, el Consejo de
Estudiantes de Facultades es la unidad organizada por
facultades, escuelas o dependencias equivalentes, para
representar a los estudiantes de éstas. Art. 3.3 del
Reglamento General de Estudiantes de la Universidad de
Puerto Rico, *supra*.

Ambos organismos tienen las siguientes atribuciones
y responsabilidades:

1. Representar oficialmente al estudiantado que los haya elegido en los actos que se celebren dentro y fuera de la Universidad.

2. Servir de foro del estudiantado para la discusión y el esclarecimiento de los problemas que atañen a los estudiantes, a la comunidad universitaria y la comunidad en general.

3. Exponer, ante las autoridades correspondientes, sus opiniones y recomendaciones relativas a las situaciones que afectan a sus representados y la comunidad en general.

4. Realizar y auspiciar actividades culturales, sociales, recreativas, científicas, académicas, educativas, y de orientación, entre otras, que complementen la educación universitaria.

5. Formular su reglamento interno a tono con el Reglamento General de Estudiantes y el reglamento de estudiantes de la unidad.

6. Participar, según se disponga, en los procesos que la Universidad establezca para la creación y enmienda de reglamentos y políticas estudiantiles, académicas e institucionales; en especial, en la formulación de enmiendas a este Reglamento, al Reglamento General de la Universidad de

Puerto Rico y a los reglamentos y normas de su unidad institucional.

7. Participar en el proceso de selección y evaluación del Procurador Estudiantil, de conformidad a las medidas que a tales efectos establezca el Recto de cada unidad institucional.

8. Convocar a sus representados a asambleas de estudiantes y promover su participación en dichas asambleas y en el proceso eleccionario.

9. Reunirse con el Rector, el Decano de Estudiantes o el Decano de Facultad, según corresponda, por lo menos dos veces por semestre.

10. Escoger de su propio seno los miembros de su directiva, salvo que el reglamento de estudiantes de la unidad institucional disponga para la elección directa de la misma o de alguno de sus integrantes, conforme a lo dispuesto en el Capítulo V de este Reglamento.

11. Crear comités u organismos y establecer su organización de conformidad con su reglamento interno.

Además, el Consejo General de Estudiantes tiene las siguientes atribuciones y responsabilidades:

1. Proponer al Senado Académico, Rector y otros foros universitarios, la formulación de normas o políticas institucionales sobre cualquier asunto que estimen pertinente y recibir su respuesta oficial.

2. Formular recomendaciones a la Junta Universitaria, al Presidente y a la Junta de Síndicos sobre las propuestas que surjan de los Senados Académicos, Juntas Administrativas u organismos análogos.

3. Recibir, según se vayan aprobando, copia de todas las certificaciones y documentos normativos que surjan de estos cuerpos y funcionarios mencionados en el inciso anterior en la forma acostumbrada.

4. Consultar con los demás Consejos Generales de Estudiantes sobre decisiones que tengan impacto sobre la Universidad como sistema, mediante los procedimientos y estructuras que faciliten dichas consultas.

Art. 3.4 del Reglamento General de Estudiantes de la Universidad de Puerto Rico, supra.

Como puede apreciarse, estas estructuras de representación estudiantil son parte de la Universidad. Sus facultades y responsabilidades denotan que se crearon con el propósito de asistir a la Universidad en la consecución de sus metas. En otras palabras, estos organismos le permiten a los estudiantes contribuir, de forma organizada, a que la Universidad de Puerto Rico pueda lograr sus objetivos. Así, como miembros de la comunidad académica, los estudiantes son colaboradores en la misión de cultura y servicio de la Universidad. Art. 10(a) de la Ley Núm. 1, supra. Ahora bien, a ninguno de estos órganos de representación estudiantil se le reconoce la prerrogativa o facultad de negociar colectivamente con la Universidad.

En ese sentido, el Consejo General de Estudiantes y el Consejo de Estudiantes de Facultades son sustancialmente disímiles a las organizaciones obreras que se constituyen bajo Ley Núm. 130 de 8 de mayo de 1945, según enmendada, conocida como la Ley de Relaciones del Trabajo de Puerto Rico, 29 L.P.R.A. sec. 61 et seq. y bajo la Ley Nacional de Relaciones del Trabajo, supra. Conforme con estos estatutos, las

organizaciones obreras que se constituyen para representar a los trabajadores se crean para negociar colectivamente con el patrono los salarios, horas de trabajo, condiciones de empleo, y todo lo pertinente a disputas y a quejas y agravios. Véanse, Arts. 2(10) y 5 de la Ley de Relaciones del Trabajo de Puerto Rico, 29 L.P.R.A. secs. 63(10) y 66; 29 U.S.C.A. sec. 152(5). Precisamente para hacer efectivo el proceso de negociación colectiva estas leyes le reconocen expresamente a los empleados el derecho a huelga. Véanse, Art. 13 de la Ley de Relaciones del Trabajo de Puerto Rico, 29 L.P.R.A. sec. 74; 29 U.S.C.A. sec. 163. Debido a que el Consejo General de Estudiantes y el Consejo de Estudiantes de Facultades no son uniones u organizaciones obreras autorizadas a negociar colectivamente con la Universidad, no tienen la autoridad legal para convocar a una huelga.

Los estudiantes, por definición, no son empleados de la Universidad, con derecho a negociar convenios o a irse a huelga para adelantar sus objetivos. Su relación con la universidad es de naturaleza contractual. Véanse, Ross v. Creighton University, 957 F. 2d 410, 416 (7mo Cir. 1992); Zumbrun v. University of S. Cal., 101 Cal. Rptr. 499, 504 (Cal. Ct. App. 1972) y casos allí citados; H. B. Hilborn, Students-Athletes and Judicial Inconsistency: Establishing a Duty to Educate as a Means of Fostering Meaningful Reform of Intercollegiate Athletics, 89 Nw.

U.L. Rev. 741, 748 (1995); K. Sarabyn, Free Speech at Private Universities, 39 J.L. & Educ. 145, 158-159 (2010). Véase, además y en general, M. Zolandz, Storming the Ivory Tower: Renewing the Breach of Contract Claim by Students Against Universities, 69 Geo. Wash. L. Rev. 91 (2000).

Cada estudiante firma un acuerdo con la U.P.R. en la que la segunda se compromete a enseñar y el primero a cumplir con sus deberes académicos. Por eso, el estudiante que no mantiene los requisitos académicos que la institución exige puede ser excluido de continuar sus estudios en la institución. Por su parte, si la U.P.R. no provee la educación que contrató con el estudiante se expone a acciones drásticas por su incumplimiento, tanto de parte de los estudiantes afectados como de parte de las agencias del estado que velan por el cumplimiento del ofrecimiento académico. La U.P.R. está obligada a garantizar su oferta académica a todos los estudiantes. Véanse, Art. 2(a)(1) de la Ley Núm. 1, supra; Sobre el cumplimiento de los contratos, en general, véanse los Arts. 1041, 1042, 1044, 1206, 1207, 1210, 1213 del Código Civil de Puerto Rico, 31 L.P.R.A. secs. 2991, 2992, 2994, 3371, 3372, 3375, 3391.

Por ende, ningún grupo de estudiantes, oficial o no, sea una mayoría o una minoría, ni mucho menos un estudiante en su carácter individual, tienen el derecho de evitar que la universidad cumpla con su ofrecimiento

académico e impedir que aquellos estudiantes que así lo deseen asistan a clase. No hay referéndum, asamblea ni votación -sea electrónica o por papeleta, ya sea abierta o secreta- que conceda el derecho a ningún estudiante o grupo de estudiantes para interferir con el derecho de tan siquiera uno de sus pares a recibir su enseñanza. El derecho a protestar de los recurridos y aquellos que piensan como ellos es incuestionable. A lo que no tienen derecho es a obligar a los demás a unirse a su protesta. Recuérdese que tal y como los recurridos tienen el derecho a protestar, la Constitución también le reconoce a los estudiantes que piensen distinto el derecho a no expresarse y a no unirse a la protesta. *"There is necessarily, and within suitably defined areas, a First Amendment freedom not to speak publicly, one which serves the same ultimate end as freedom of speech in its affirmative aspect".* Harper & Row, Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 559 (1985). Véase, además, Bartnicky v. Vopper, 532 U.S. 514, 533 n. 20 (2001).

Reafirmamos que los estudiantes tienen ese derecho a expresarse o a no hacerlo, como cualquier otro ciudadano. Su condición de estudiantes no les priva de ese derecho constitucional. Incluso, el Reglamento General de Estudiantes de la U.P.R. reconoce expresamente cuáles son los derechos de expresión que tienen los estudiantes: el derecho a expresarse, a asociarse y reunirse libremente,

a formular peticiones, a llevar a cabo actividades igual que cualquier otra persona en Puerto Rico, así como el derecho a celebrar piquetes, marchas, mítines y otros géneros de expresión dentro del campus universitario. Véase, Art. 2.15 del Reglamento General de Estudiantes de la Universidad de Puerto Rico, supra. El único límite impuesto es que todos esos derechos se ejercen sin impedir que los demás ejerzan los suyos y sin impedir que se lleve a cabo la misión universitaria de educar. Por eso, el Art. 2.18 del Reglamento hace claro que ningún estudiante podrá interrumpir, obstaculizar ni perturbar las tareas regulares de la universidad mientras realiza las actividades expresivas que hemos enumerado.

**Lo que los estudiantes recurridos llaman una "huelga" no es otra cosa que una protesta estudiantil colectiva y organizada. Aunque los estudiantes no tienen derecho a huelga, sí pueden protestar de manera organizada y coordinada, siempre que no incumplan los deberes que asumieron como estudiantes y que están en el Reglamento de Estudiantes, y siempre que no interfieran impermisiblemente con la normalidad de las tareas universitarias y los derechos de aquellos que no piensan como ellos y que quieren asistir a clase.**

La U.P.R. alega que los recurridos impidieron la entrada al recinto universitario, detuvieron por completo la toma de clases, afectaron el derecho de los estudiantes interesados en completar sus grados

académicos o sus cursos semestrales, paralizaron las labores institucionales, amenazaron la acreditación institucional y perturbaron tanto el orden como la seguridad, la normalidad y la continuidad de las tareas universitarias. En fin, se alega que los recurridos tomaron el control de un recinto universitario y pretenden hacerlo otra vez. De probarse, esa conducta plantea un impedimento sustancial y material al propósito central de la Universidad de Puerto Rico como primer centro docente de nuestra Isla.

Los tribunales le debemos gran deferencia al juicio de la administración universitaria de procurar el orden en el contexto colegial, siempre que no se transgreda la libertad de expresión y el derecho de los estudiantes a protestar. El escrutinio intermedio antes reseñado faculta a los foros judiciales a hacer ese balance de los intereses en pugna y salvaguardar los intereses involucrados.

**D. El remedio del interdicto permanente y sus efectos sobre la libertad de palabra.**

En Madsen v. Women's Health Ctr., 512 U.S. 753 (1994), el Tribunal Supremo federal articuló que un interdicto, por el mero hecho de aplicar a un grupo en particular, no constituye una restricción del contenido de una expresión protegida. *An injunction, by its very nature, applies only to a particular group (or individuals) and regulates the activities, and perhaps the speech, of that group. It does so, however, because*

*of the group's past actions in the context of a specific dispute between real parties".* Madsen v. Women's Health Ctr., supra, pág. 762. El mero hecho de que el interdicto afecte a un grupo de personas con la misma visión sobre determinado asunto no significa que su propósito sea limitar el contenido de la expresión y que, por ende, le aplique un escrutinio judicial estricto. Id., págs. 763-764.

Un interdicto que incida sobre la libertad de expresión difiere en su naturaleza de una reglamentación o legislación que haga lo mismo. Id., pág. 764. Una reglamentación o legislación afecta el contenido de la expresión mediante dictámenes legislativos de aplicación general que procuran propulsar ciertos intereses particulares de la sociedad. Id. En contraste, el interdicto es un remedio que aplica a personas particulares y es concedido por un juez porque una parte violó un decreto legislativo o judicial. Id. Debido a lo anterior, el interdicto puede representar un riesgo mayor de censura y aplicación discriminatoria, ya que no ha gozado del debate público inherente al foro legislativo. Id. Es por ello que el escrutinio judicial aplicable a interdictos judiciales será más riguroso que el que se estableció en Perry Education Assn. v. Perry Local Educator's Assn., supra, para toda regulación que afecta el tiempo, lugar y la manera de una expresión en un foro público tradicional o por designación.

Al considerar un interdicto judicial que incide sobre el lugar, el momento o la forma de la expresión, los tribunales debemos examinar si el *injunction* representa una limitación a la actividad expresiva más allá de lo necesario para alcanzar el interés significativo que persigue el Estado. Id., pág. 765. ("*We must ask instead whether the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest.*") Véanse, además, Schenck v. Pro-Choice Network, 519 U.S. 357, 372 (1997); J.E. Nowak & R.D. Rotunda, op. cit., págs. 1463-1464. Igualmente, el interdicto debe estar diseñado estrechamente para alcanzar sus objetivos específicos. Madsen v. Women's Health Ctr., supra, pág. 767.

En conclusión, la administración universitaria está en mejor posición que un tribunal para diseñar la política pública que adelanta sus objetivos pedagógicos. Además, el remedio de *injunction* que solicita la U.P.R. es el adecuado cuando están en pugna los derechos a la libertad de palabra de los estudiantes y el interés en la necesidad del orden y la disciplina en el contexto universitario.

## VI

Recapitulamos:

- Este pleito no es académico. Así lo demuestra la conducta de los estudiantes recurridos luego del acuerdo alcanzado tras un proceso de mediación.

Su proceder al declarar un "voto preventivo de huelga estudiantil" es un indicio razonable de que podría volver a ocurrir otra paralización de la U.P.R. y que la intención de los estudiantes recurridos nunca fue culminar con la controversia de autos.

- Este caso presenta interrogantes constitucionales sustanciales, relacionadas con los derechos de los estudiantes, que podrían escapar a nuestros pronunciamientos y que requieren una pronta atención. Por ello el caso es certificable.

- El campus de nuestra universidad pública es un foro limitado por designación, también conocido como foro semipúblico. Eso se desprende de la misión que el legislador le asignó a la Universidad de Puerto Rico, de servir a toda la sociedad y no solo a sus componentes. En fin, la U.P.R. es patrimonio de todos los puertorriqueños y no solamente de los que en ella estudian o laboran.

- Los estudiantes gozan de todas las protecciones amplias de libre expresión y asociación que la Constitución federal y la Constitución de Puerto Rico garantizan a todas las personas.

- El Consejo de Estudiantes es el organismo representativo de los estudiantes en la estructura administrativa universitaria. Sus

facultades están delimitadas por ley y reglamento.

- No obstante, debe quedar claro que el Consejo de Estudiantes no es una unión laboral y que los estudiantes no gozan del derecho a huelga que la Constitución y las leyes le reconocen a los obreros. La relación entre los estudiantes y la Universidad se basa en un acuerdo de estudios y no en un contrato de trabajo.

- Lo que los estudiantes llaman "huelga" no es otra cosa que una protesta organizada. Ningún individuo o grupo tiene derecho a forzar a otro a unirse a su protesta. Por eso, el llamado "voto de huelga estudiantil" y el reclamo de que todos los estudiantes vienen obligados por él es ilegítimo. Ninguna asamblea, referéndum o votación (electrónica o en papel) puede obligar a nadie a unirse a una protesta en la que no cree.

- La administración de la U.P.R. tiene la obligación de salvaguardar el ejercicio libre y ordenado de los derechos constitucionales de expresión y asociación de todos los estudiantes, tanto los de los estudiantes recurridos y quienes coinciden con su protesta, como los de aquellos que discrepan de esas posiciones.

- Ahora bien, por tratarse de un foro semipúblico, la administración de la U.P.R. puede reglamentar

el ejercicio libre y ordenado de los derechos de expresión y asociación de la comunidad universitaria, incluyendo los estudiantes, para asegurarse de que las manifestaciones y protestas dentro del campus universitario no interrumpan el flujo normal de la tareas universitarias ni atenten contra los derechos de los individuos dentro de la comunidad universitaria.

- Existe un interés gubernamental significativo de garantizar el orden y la disciplina en el foro universitario, lograr un ambiente académico que cumpla con el fin educativo de la institución universitaria, proteger el derecho a estudiar de los estudiantes que deseen hacerlo, permitir que el pueblo tenga acceso al cúmulo de recursos que provee la Universidad de Puerto Rico, y procurar la integridad y eficiencia institucional de nuestro primer centro docente. La administración universitaria está en mejor posición que un tribunal para diseñar la política pública que adelanta sus objetivos pedagógicos.

- Por consiguiente, la administración de la U.P.R. puede reglamentar el tiempo, lugar y la manera en que los estudiantes y demás componentes de la comunidad universitaria ejercen actividades de expresión protegida dentro del campus universitario, tales como manifestaciones o

protestas, siempre que esa reglamentación: (1) sea neutral en cuanto al contenido de la expresión y no prohíba absolutamente que los manifestantes expresen sus puntos de vista; (2) haya sido diseñada estrechamente para que no se interrumpan o perjudiquen sustancialmente las tareas universitarias ni se violen los derechos de todos los componentes de la comunidad universitaria; y (3) no impida medios alternativos de comunicación.

- De igual modo, cualquier *injunction* u orden que emita el tribunal a petición de la administración universitaria tiene que cumplir con ese mismo escrutinio constitucional. La orden no debe limitar la actividad expresiva más allá de lo necesario y debe estar diseñada estrechamente para alcanzar el interés significativo que persigue el Estado.

## VII

Por los fundamentos anteriores, se expide el auto de certificación y se revoca la sentencia del Tribunal de Primera Instancia, Sala de San Juan. Se devuelve el caso a dicho foro para que continúe con los procedimientos de conformidad con lo aquí resuelto. El tribunal citará a las partes a una vista de *injunction* permanente con la premura que la situación amerita. Además, evaluará la prueba de conformidad con los parámetros y el escrutinio

constitucional explicados en esta Opinión, de manera que se garanticen los derechos constitucionales y estatutarios de todas las partes.

Se dictará sentencia de conformidad.

RAFAEL L. MARTÍNEZ TORRES
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Universidad de Puerto Rico

      Peticionarios

            v.

                        CT-2010-008

Gabriel Laborde Torres y otros

      Recurridos

SENTENCIA

En San Juan, Puerto Rico, a 13 de diciembre de 2010.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte integrante de la presente Sentencia,, se expide el auto de certificación y se revoca la sentencia del Tribunal de Primera Instancia, Sala de San Juan. Se devuelve el caso a dicho foro para que continúe con los procedimientos de conformidad con lo aquí resuelto. El tribunal citará a las partes a una vista de *injunction* permanente con la premura que la situación amerita. Además, evaluará la prueba de conformidad con los parámetros y el escrutinio constitucional explicados en la Opinión del Tribunal, de manera que se garanticen los derechos constitucionales y estatutarios de todas las partes.

Se ordena la publicación inmediata de esta Sentencia. Notifíquese de inmediato, por *fax* o teléfono, y mediante notificación personal diligenciada hoy mismo por un alguacil de este Tribunal, a las partes por conducto de sus abogados.

Lo acordó el Tribunal y certifica la Secretaria del Tribunal Supremo. La Jueza Asociada señora Fiol Matta disiente con opinión escrita. La Juez Asociada señora Rodríguez Rodríguez disiente con opinión escrita. El Juez Presidente señor Hernández Denton está inhibido.


                              Aida Ileana Oquendo Graulau
                              Secretaria Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Universidad de Puerto Rico

    Peticionaria

        v.                    CT-2010-008    Certificación

Gabriel Laborde Torres y Otros

    Recurridos

Voto de Inhibición emitido por el JUEZ PRESIDENTE SEÑOR HERNÁNDEZ DENTON

San Juan, Puerto Rico, a 13 de diciembre de 2010.

En vista de que mi señora esposa, la Lcda. Isabel Picó Vidal, Catedrática Retirada de la Universidad de Puerto Rico, es Miembro de la Junta de Síndicos de la referida institución universitaria desde el año 2001, por imperativos éticos, nos inhibimos de entrar a considerar los méritos del presente caso.

                         Federico Hernández Denton
                            Juez Presidente

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Universidad de Puerto Rico
    Peticionaria

        v.

                                    CT-2010-08

Gabriel Laborde Torres y otros
        Recurridos

Voto disidente emitido por la Jueza Asociada Fiol Matta acogiéndose al término provisto por la Regla 5 del Reglamento del Tribunal Supremo de Puerto Rico.


En San Juan, Puerto Rico, a 13 de diciembre de 2010.

Disiento del trámite atropellado adoptado por la mayoría en este caso. La ponencia que hoy es Opinión mayoritaria se circuló en horas de la tarde del 6 de diciembre de 2010, con el propósito de certificarla el 13 de diciembre de 2010. De esa forma, los compañeros que suscriben la Opinión mayoritaria entendieron que unos seis días eran suficientes para estudiar y reaccionar a una ponencia de 79 páginas que atiende asuntos de alto interés público. Por el contrario, se trata de un término excesivamente corto que no nos permite desempeñar nuestro magisterio de forma sosegada y responsable.

Generalmente, un foro colegiado está regido por el intercambio y la consideración ecuánime de las distintas posiciones de los magistrados. Se fomenta así la formulación de ponencias equilibradas, con el mayor insumo de criterios y perspectivas.[7] Ciertamente, nuestro Reglamento permite acortar términos; pero esa alternativa, por las razones antes dichas, debe utilizarse en contadas ocasiones. Sin embargo, se está convirtiendo en una práctica más que una excepción. Ello da la impresión de que no se valora la acción concertada ni el diálogo y menos aún la conveniencia y deseabilidad de que, de haber una postura disidente, ésta pueda exponerse como parte de la expresión conjunta del Foro, pues, después de todo, el Tribunal no está compuesto solamente por los que están de acuerdo con la mayoría. Véanse, como ejemplos más recientes de esta dinámica, Domínguez Castro v. E.L.A., 2010 T.S.P.R. 11, res. de 2 de febrero de 2010, e In re Solicitud para aumentar el número de jueces en el Tribunal Supremo, 2010 T.S.P.R. 214, res. de 5 de noviembre de 2010. Cabe señalar que en esos casos, al igual que en éste, la mayoría del Tribunal acortó términos **después** de haberse redactado y circulado la Opinión mayoritaria. De esa manera, el Juez ponente pudo aprovechar todo el tiempo que entendió necesario para elaborar su ponencia, a la vez

---

[7] "Para impartir justicia y elaborar doctrinas jurídicas adecuadas, un tribunal colegiado tiene que disponer del sosiego y del reposo intelectual necesarios, sin los cuales toda discusión entre mentes debidamente instruidas es imposible". In re Aumento ; Pueblo v. Rosario González, 80 D.P.R. 318, 328 (1958).

que se limitaron las opciones a quienes quisieran expresarse sobre su recomendación.

La práctica de acortar el término para considerar una ponencia mayoritaria no nos permite formular recomendaciones y señalamientos que puedan servir para atemperar perspectivas y hasta para reconciliar posturas a la hora de sumar votos a la ponencia circulada. Además, prácticamente nos imposibilita redactar una respuesta a la altura de la controversia que tenemos ante nuestra consideración. La única alternativa en ocasiones como la presente, es ejercer la opción de reservarnos el derecho de certificar una ponencia sobre los méritos de la controversia después de que se certifique la Opinión mayoritaria. Por eso, me acojo al derecho de emitir una ponencia fundamentada en el término de diez días, según permite el Reglamento del Tribunal Supremo de Puerto Rico, 4 L.P.R.A. Ap. XXI-A, R. 5(b).

No obstante, habré de adelantar algunas preocupaciones.

El caso de autos debe devolverse al Tribunal de Primera Instancia para que disponga sobre el remedio de *injunction* solicitado. Sin embargo, la Opinión que hoy emite el Tribunal en certificación va mucho más allá. Al dictarle al Tribunal de Primera Instancia los criterios a los que debe responder ese dictamen la Opinión restringe gravemente la discreción del foro de instancia en lo que

es, precisamente, un recurso altamente discrecional. No hay ninguna necesidad jurídica para ello.

La acción de *injunction*, por su potencial de limitar las actividades legítimas de los ciudadanos está claramente regulada y los criterios para su concesión están ampliamente desarrollados por abundante jurisprudencia tanto nuestra como federal. La insistencia de la mayoría en comparar estudiantes y obreros, en exponer su criterio sobre las actividades de expresión que por uso y costumbre llamamos "huelgas estudiantiles" y en elaborar extensamente sobre su particular visión de la Universidad Pública no pasan de ser lo que en lenguaje jurídico se llama *dicta*, es decir, expresiones innecesarias para la solución del caso, que no tienen efecto jurídico y que se deben tener por no puestas.

No son, sin embargo, expresiones innocuas, pues pretenden reducir el marco de análisis de los complejos problemas que enfrenta nuestro principal centro docente a dualismos simplistas, a saber, "legal/ilegal", "estudiantes/obreros" y el más peligroso: "deber contractual de enseñar/deber contractual de aprender". Peca también la Opinión de un enfoque generalizador que puede confundir al foro de instancia en cuanto a quiénes pueden estar incluidos en el dictamen de ese foro, en caso de que entienda procedente el remedio solicitado. 32 L.P.R.A. Ap. V, R. 57.5. Esta ambigüedad, mal entendida, puede resultar en violaciones al derecho de libertad de

expresión de los estudiantes de la Universidad de Puerto Rico.  Por último, la discusión sobre la naturaleza del espacio universitario como foro semi-público en lo que se refiere a la libertad de expresión, requiere, de por sí, mucha ponderación y análisis crítico.

Es evidente, pues, la trascendencia y complejidad de esta decisión, así como la necesidad de un término mayor al que la mayoría tuvo a bien conceder, para elaborar en torno a las preocupaciones expuestas.


                                        Liana Fiol Matta
                                        Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Universidad de Puerto Rico

    Peticionarios

       v.                  CT-2010-8

Gabriel Laborde Torres
y otros

    Recurridos


Opinión disidente emitida por la Juez Asociada señora Rodríguez Rodríguez


San Juan, Puerto Rico, a 13 de diciembre de 2010


> "La Primera Enmienda se va de la Universidad de Puerto Rico."
> Rafael Martínez Torres, 1983

Disiento del curso que traza una mayoría del Tribunal por dos razones fundamentales, a saber: porque tengo una visión muy distinta del ámbito de protección que ofrece la Constitución del Estado Libre Asociado de Puerto Rico al derecho de todo ciudadano a expresarse, y porque creo que la Universidad es mucho más que un mero centro de estudios, más que un lugar para la transmisión, producción y difusión del conocimiento. El *êthos* universitario es el de la búsqueda irrenunciable de la verdad como presupuesto

indispensable para la libertad, la transmisión del saber y la discusión abierta, crítica y libre de cualquier asunto. Las universidades son, a fin de cuentas, centros de imaginación de lo posible.[8] Considero entonces que para el ejercicio puntual de este quehacer, es indispensable que exista un recinto adecuado en el cual prime ese diálogo abierto y crítico de parte de quienes aspiren a la verdad y precian su libertad. La protección de ese espacio de efervescencia debería ser nuestro norte, pues sólo así hacemos realidad el significado del nombre que lleva esta institución, *universitatis.*

La opinión que emite la mayoría de este Tribunal abre la puerta a limitar el derecho a la libre expresión en nuestro principal centro académico, al no justipreciar el alcance de nuestra tradición universitaria de tolerancia hacia la expresión y la discusión libre de temas diversos y divergentes. El *ratio* de la opinión mayoritaria --o su razón de ser-- es hacer viable lo que ya se había anticipado por distintos funcionarios gubernamentales, circunscribir el derecho a la expresión de los estudiantes a un espacio específico y limitado, el cual el gobierno concede por mera liberalidad. Véase, Anejo 1. Porque creo que en nuestro país la tradición vivida por décadas en nuestra Universidad la imbuye con las características de un foro público tradicional, rechazo enérgicamente el más reciente acto de acotamiento de derechos ciudadanos que ultima el "nuevo" Tribunal.

I

---

[8] Efrén Rivera Ramos, *La universidad y lo posible*, 78 Rev. Jur. U.P.R. 643 (2009).

Debemos comenzar destacando que debido al apresurado, atropellado y acomodaticio trámite que la mayoría concede al caso de autos --reduciendo los términos reglamentarios del Tribunal para certificar la ponencia circulada a sólo cinco días, de suerte que pueda coincidir con el inicio de una huelga universitaria pautada para mañana-- nos vemos precisados a limitar nuestra discusión sólo a identificar una parte del errado razonamiento expuesto por el Tribunal.

La mayoría concluye en su ponencia que la Universidad de Puerto Rico es un foro público por designación. Para llegar a esta conclusión se parte de la premisa de que "tanto en la jurisdicción federal como en la local, los recintos universitarios no se catalogan como foros públicos tradicionales". Opinión mayoritaria, pág. 36. Lo cierto es, que la mayoría llega a esta conclusión luego de tergiversar el derecho federal aplicable como mecanismo para forzar su conclusión.

El derecho de los ciudadanos a expresarse libremente está reconocido en la Sección 4 del Artículo II de la Carta de Derechos de nuestra Carta Magna. Art. II, Sec. 4, Const. E.L.A., 1 L.P.R.A. Este derecho de carácter fundamental se encuentra fuertemente arraigado a las nociones más básicas, y esenciales, de nuestro sistema democrático de gobierno. *Vigoreaux Lorenzana et als. v. Quizno's Sub, Inc. et als.*, 2008 T.S.P.R. 38, pág. 16, 173 D.P.R. __ (2008); *Bonilla v. P.N.P.*, 140 D.P.R. 294, 299 (1996); *Mari Bras v. Casañas*, 96 D.P.R. 15, 20-21 (1968). Sin embargo, ya hemos expresado que el mismo no es uno absoluto. Así, por ejemplo, el derecho a la libre expresión puede encontrar sus límites al enfrentarse al

derecho a la intimidad de otra persona. *Véase*, *Colón v. Romero Barceló*, 112 D.P.R. 573 (1982).

Asimismo, en algunos casos, el derecho de la libertad de expresión en propiedad pública podría verse limitado mediante regulación gubernamental sobre el tiempo, lugar y manera de llevar a cabo la expresión. *Véase*, *U.N.T.S. v. Srio. de Salud*, 133 D.P.R. 153 (1993). La validez de dicha regulación estará sujeta a las características de la propiedad en cuestión y su clasificación como: 1) foro público tradicional; 2) foro público por designación; o 3) foro no público. *Id.*

Los foros públicos tradicionales se han definido como "lugares que por larga tradición o por fíat del gobierno se han dedicado a la reunión y al debate". *Perry Ed. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 45 (1983). Ejemplos clásicos de esta clase de foro son los parques, calles y aceras, los cuales **se han mantenido disponibles para el uso del pueblo, donde las personas se pueden reunir, comunicar y compartir sus pensamientos y discutir asuntos de interés público**. *Id.* En estos predios el Estado no puede vedar de forma absoluta la libertad de expresión, sólo puede regular el tiempo, lugar y modo en que se realizará la expresión. Ello siempre y cuando las limitaciones "responda[n] a un interés gubernamental significativo, limite la intervención a la mínima necesaria para alcanzar su objetivo y deje abiertas alternativas para la expresión". *U.N.T.S. v. Srio. de Salud*, *supra*, pág. 163, citando a *Perry Ed. Assn. v. Perry Local Educators' Assn.*, *supra*, pág. 46.

De otra parte, los foros no públicos son propiedades del Estado que no se relacionan con el intercambio de ideas y la libre comunicación de pensamiento entre los ciudadanos. *Perry Ed. Assn. v. Perry Local Educators' Assn.*, *supra*, pág. 46. Los centros hospitalarios, los tribunales, y dependencias policiacas son muestras claras de esta categoría. En estos lugares la regulación gubernamental puede limitar la libre expresión que allí se produzca, de manera que sólo se permita aquélla que sea compatible con el objetivo de la propiedad. En cuanto a la validez de dicha regulación, basta con que la misma sea razonable y, además, neutral en cuanto a puntos de vista; sujeto a que no se trate de un disfrazado esfuerzo por suprimir la expresión. *U.N.T.S. v. Srio. de Salud*, *supra*, pág. 164, citando a *International Soc'y for Krishna Conciousness, Inc. v. Lee*, 505 U.S. 672 (1992); *Cornelius v. NAACP Legal Defense & Ed. Fund.*, 473 U.S. 788 (1985); *Perry Ed. Assn. v. Perry Local Educators' Assn.*, *supra*.

Finalmente, entre estas dos clasificaciones se encuentran los foros públicos por designación. Estos predios son generalmente foros no públicos en los que el Estado decide abrir un espacio para la actividad expresiva, aun cuando no está obligado a hacerlo. *Perry Ed. Assn. v. Perry Local Educators' Assn.*, *supra*, pág. 45. De manera que se trata de **lugares no creados originalmente para la libre comunicación, pero en los cuales se ha permitido la actividad expresiva**. Las bibliotecas, las escuelas y los teatros estatales suelen ser utilizados como foros públicos por designación. *Rodríguez v. Srio. de Instrucción*, 109 D.P.R. 251, 256-57 (1979); *Southeastern Promotions, Ltd. v.*

*Conrad*, 420 U.S. 546 (1975). Mientras estos espacios están abiertos a la actividad expresiva, el poder del Estado para regular la libertad de expresión se encuentra tan limitado como cuando se trata de un foro público tradicional. *U.N.T.S. v. Srio. de Salud*, *supra*, pág. 163, citando a *Perry Ed. Assn. v. Perry Local Educators' Assn.*, *supra*, págs. 45-46.

No obstante, hay una gran diferencia entre foros públicos tradicionales y foros públicos por designación. **El carácter público de estos últimos depende de la voluntad del Estado. Es el gobierno quien designa el espacio como uno abierto a la expresión pública. De igual forma, el Estado conserva la autoridad para determinar qué grupos podrán utilizar el espacio o qué temas se podrán discutir en él**. *U.N.T.S. v. Srio. de Salud*, *supra*, pág. 164, citando a *Perry Ed. Assn. v. Perry Local Educators' Assn.*, *supra*, pág. 48. **Más aún, la autoridad estatal podría cerrar la propiedad a la actividad expresiva por parte de la ciudadanía en general, retornando a su carácter no público**. *Véase*, *Perry Ed. Assn. v. Perry Local Educators' Assn.*, *supra*, pág. 46. Tales facultades están ausentes cuando se trata de foros públicos tradicionales. Éstos siempre deben permanecer abiertos al flujo de ideas y pensamientos que son parte inherente de la naturaleza misma de estos predios. Allí no se puede delimitar qué grupos o temas se beneficiarán del acceso a la propiedad. La regla es sencilla: todos están invitados a ejercer su derecho a la libertad de expresión. Por ello, aunque hay similitudes entre los foros públicos tradicionales y los foros públicos

por designación, en realidad, los ciudadanos gozan de mayor protección en los primeros.

**Ahí radica el afán de la mayoría de catalogar la Universidad como un foro público por designación**. Esta determinación no es más que la semilla sembrada en concierto, que habrá de germinar --o que ya germinó-- en el proceder del Estado y las autoridades universitarias de designar un lugar restringido para "ejercer" el derecho a la libre expresión.

## II

En lo que representa un golpe mortal a la Universidad de Puerto Rico y a nuestro sistema democrático, la mayoría del Tribunal hoy cataloga a la Universidad como foro público por designación. Para ello utiliza fundamentos que, bien leídos, revelan lo errado de su proceder. Veamos.

La Opinión mayoritaria cita *Widmar v. Vincent*, 454 U.S. 263 (1981), para establecer que en la jurisdicción federal se ha decidido que los recintos universitarios no se pueden comparar con los foros públicos tradicionales "por sus objetivos pedagógicos y académicos". Opinión mayoritaria, pág. 36.[9] En primer lugar, debemos dejar claro que la cita utilizada por la mayoría del Tribunal no es más que un mero *dictum* en una nota al calce de una opinión. Además, la referida cita, verdaderamente, no expresa que las universidades no sean comparables con los foros

---

[9] "A university differs in significant respects from public forums such as streets or parks or even municipal theaters. A university's mission is education, and decisions of this Court have never denied a university's authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities." *Widmar v. Vincent*, 454 U.S. 263, 268, n. 5 (1981).

públicos tradicionales, y mucho menos dice que dichas instituciones no sean foros públicos tradicionales. La expresión de la Corte Suprema sólo aclara que las instituciones universitarias no son iguales *a algunos* foros públicos, como calles, parques y teatros. Ello en parte por su misión educativa. Sin embargo, nada en la opinión de la Corte dispone del carácter tradicional o por designación de la universidad, y aun si lo hiciera, ello se limitaría a la institución universitaria sobre la cual se pasaba juicio en aquel entonces.

La expresión citada por la mayoría del Tribunal no impone juicio alguno sobre este Foro en cuanto a la controversia que hoy atendemos. Por un lado, este Foro siempre puede hacer uso de la factura más ancha que distingue nuestra Carta de Derechos de las delineaciones mínimas sobre derechos individuales que se establecen en la jurisdicción federal, para brindar mayor protección a nuestros ciudadanos frente a la intromisión gubernamental. *Bayrón Toro v. Serra*, 119 D.P.R. 605, 618 (1987). Asimismo, los fundamentos históricos y realidades prácticas que inspiran las decisiones de los foros federales en el ámbito de la doctrina del foro público, pueden no ser iguales al desarrollo histórico de nuestra sociedad. Estas divergencias justifican distanciarnos de doctrinas elaboradas en las cortes federales, de manera que se amplíen los derechos individuales conforme a nuestras tradiciones. Ya hemos resuelto que la Constitución del Estado Libre Asociado "tiene un origen y un historial distinto a la Constitución de Estados Unidos . . . Nuestra Constitución reconoce y concede unos derechos fundamentales

con una visión más abarcadora y protectora que la Constitución de Estados Unidos." *López Vives v. Policía de P.R.,* 118 D.P.R. 219, 226-227 (1987). Véase también, *Emp. Pub. Des., Inc. v. H.I.E.Tel.,* 150 D.P.R. 924 (2000).

En segundo lugar, la Opinión mayoritaria también cita *Coss y U.P.R. v. C.E.E.,* 137 D.P.R. 877, 889 (1995), como fundamento para concluir que este Foro ha catalogado la Universidad de Puerto Rico como uno no público tradicional. Opinión mayoritaria, pág. 36.[10] Nuevamente, son varios los defectos del razonamiento expuesto por la mayoría. Aclaramos una vez más que la citada expresión es sólo un *dictum* traído de otra decisión de la jurisdicción federal, y originado en la discusión sobre la libertad de expresión en predios escolares, no universitarios. También recordamos que en *Coss y U.P.R. v. C.E.E.,* *supra*, sólo se cuestionaba el carácter público de *un medio de expresión o foro* dentro de la Universidad: el periódico Diálogo. No se discutió entonces las características de *toda* la Universidad bajo la doctrina de foro público, como hoy pretende hacer una mayoría de este Tribunal.

III

De manera que no queda tan "claro", como dice la Opinión del Tribunal, pág. 36, que los recintos universitarios no se catalogan como foros públicos tradicionales. Por el contrario, estimo que la Universidad de Puerto Rico representa un microcosmos abarcador y

---

[10] "[L]as facilidades educativas podrían considerarse foros públicos, sólo si las autoridades escolares han- 'mediante política o por práctica'- abierto esas facilidades 'para el uso indiscriminado del público en general'." *Coss y U.P.R. v. C.E.E.,* 137 D.P.R. 877, 889 (1995), citando a *Perry Ed. Assn. v. Perry Local Educators' Assn.,* 460 U.S. 37, 47 (1983).

complejo, nutrido de una gran tradición de valores democráticos; por lo que, para evaluar nuestro primer centro docente a la luz de la doctrina de foro público, es imprescindible comprender sus propósitos, su historia, su composición y su rol en el desarrollo de nuestro país.

Si bien es cierto que "[e]n contraste con los parques, plazas y calles, considerados tradicionalmente foros por excelencia de expresión pública, las escuelas y bibliotecas estatales no se organizaron para celebrar en ellas libre intercambio comunitario", *Rodríguez v. Srio. de Instrucción*, *supra*, págs. 256-57, no es menos cierto que la Universidad es mucho más.  El libre intercambio de ideas, dinámica inherente a la institución, es precisamente lo que engrandece el proceso educativo en los centros universitarios.  *Véase*, *Sánchez Carambot v. Dir. Col. Univ. Humacao*, 113 D.P.R. 153, 159 (1982), citando a P. Monroe, *Historia de la pedagogía*, Tomo II, Madrid, 1905, pág. 145 ("Tratándose de universidades, esta norma constitucional comulga estrechamente con la esencia y razón histórica de esta institución, en la que como afirma Monroe de un modo claro, 'la libertad de discusión, tanto política como eclesiástica y teológica encontró su primer hogar'.")

Pero, quién mejor para recordarnos qué es la Universidad, que aquél cuyo nombre está indeleblemente coligado a esta institución.  En su discurso inaugural en la Universidad de Puerto Rico en 1943, nos decía Don Jaime Benítez:

> [E]ntre los objetivos de la Universidad de Puerto Rico, yo le daría jerarquía primaria a éste: enseñar a los hombres a valerse de su entendimiento y de su albedrío; ayudar a los hombres a encararse con la vida, afianzados en los recursos y en las valoraciones dentro de ese

> ideal de vida noble, creadora y generosa,
> refrendado por treinta siglos de pensamiento, que
> avanza zigzagueante a través de la historia,
> jamás del todo oscurecido, jamás del todo
> realizado, que es el ideal de vida democrática.
> **Es pues mi criterio, que el principal objetivo de
> esta universidad debe ser hacer hombres libres en
> su espíritu, hombres que no rindan la
> potencialidad creadora de su alma a nada de este
> mundo --ni al halago, ni al cliché social, ni al
> prejuicio, ni a la ambición, ni a la amenaza, ni
> al poder-- a nada en este mundo.** (Énfasis
> nuestro.)

Jaime Benítez, *La Reforma Universitaria*, 1943, en Héctor Luis Acevedo, editor, *Don Jaime Benítez Entre la Universidad y la Política*, Universidad Interamericana de Puerto Rico, 2008, págs. 467-468.

La Universidad de Puerto Rico siempre ha sido un foro de discusión abierto al debate público. Véase, Luis Nieves Falcón, Ineke Cunnigham, Israel Rivera, Francisco Torres, Hiram Amundaray, *Huelga y Sociedad*, Editorial Edil, Inc., Rio Piedras, 1982. Sus recintos siempre han recibido la más diversa gama de personas que aportan y han aportando con sus ideas al desarrollo del país. Para la producción de ese conocimiento enriquecedor se exige, "por supuesto, gozar de la posibilidad de criticar y cuestionar el conocimiento, las prácticas sociales y las creaciones culturales y tecnológicas." Efrén Ramos Rivera, *La universidad y lo posible*, 78 Rev. Jur. U.P.R. 643, 646 (2009).

Al decir de Hannah Arendt, la libertad consiste en lograr que sea lo que no ha sido.[11] Así, los grandes logros alcanzados por la Universidad de Puerto Rico han sido propiciados por el cultivo de valores democráticos que

---

[11] Hanna Arendt, *Between Past and Future*, Penguin Books, 2006, págs. 142-169, citado en Ramos Rivera, *op. cit.*, pág. 649.

nutren sus aspiraciones. Proyectos de incalculable valor como *La Nueva Constitución de Puerto Rico*, preparado por la Escuela de Administración Pública de la Universidad de Puerto Rico ––que sirvió de guía a los redactores de nuestra Constitución–– se han producido rodeados de la protección a la libertad de palabra que cobija a toda la comunidad universitaria. Y es que así tiene que ser porque en nuestro país, la educación ha estado vinculada, constitucionalmente, a los derechos humanos. El Art. II, sec. 5 de la Constitución de Puerto Rico, reconoce a toda persona "el derecho a una educación que propenda al pleno desarrollo de su personalidad y al fortalecimiento del respeto de los derechos del hombre y de las libertades fundamentales." En *Sánchez Carambot v. Dir. Col. Univ. Humacao*, *supra*, pág. 161, ya adelantábamos que:

> [E]l definitivo reconocimiento que las libertades civiles reciben en todo el ordenamiento nacional de sociedades como la nuestra, no puede ser razón hábil para menoscabar las garantías de libertad de expresión y asociación que desde tiempos pretéritos gozan los estudiantes y profesores universitarios. **Precisamente, para que las salvaguardas civiles no decaigan es imprescindible la crítica ilustrada, acuciosa y constante de parte de esos grupos dedicados al más elevado estudio. Callar sus denuncias puede poner en peligro las libertades que con tanta dificultad se plasmaron en un pasado no muy remoto. Se trata**, como advertimos en *Rodríguez v. Srio. de Instrucción*, ante, **de proteger esa discusión enérgica de las ideas, que es tan esencial para el cabal desarrollo del hombre, como para la conservación y el sostenimiento del bienestar común en una sociedad que viva en democracia.** (Énfasis nuestro) (Citas omitidas).

Los objetivos de la ley orgánica de la Universidad también reconocen que la institución es un foro sumamente ligado a nuestra sociedad democrática. Así vemos que el artículo 2 de la Ley Núm. 1 de 20 de enero de 1966, 18 L.P.R.A. sec. 601, establece que la Universidad debe

"[t]ener presente que por su carácter de Universidad y por su identificación con los ideales de vida de Puerto Rico, ella está esencialmente vinculada a los valores e intereses de toda comunidad democrática".

**Esa es, a grandes razgos, la historia de nuestra Universidad; no porque el Estado haya abierto un espacio a la libre expresión, sino porque ésa es y ha sido su tradición, su propia naturaleza. Nadie puede negar que la Universidad de Puerto Rico, mientras forja los intelectos de sus integrantes, siempre ha servido para la "reunión y el debate" y ha estado disponible para el uso del pueblo, para que los ciudadanos se reúnan pacíficamente y compartan y debatan ideas sobre los asuntos que les son de interés.** *Véase*, *Perry Ed. Assn. v. Perry Local Educators' Assn.*, *supra*, pág. 45. Ante semejante tradición, ¿cómo se puede concluir que se trata de un foro público por designación? ¿Dónde queda toda la historia de nuestro primer centro docente como punto de encuentro para el debate del más alto calibre?

### III

Unas últimas consideraciones. El caso que hoy atendemos fue traído ante nosotros del Tribunal de Apelaciones mediante una certificación intrajurisdiccional. Ésta fue solicitada por la administración de la Universidad de Puerto Rico apenas un día luego de haber presentado ante el foro apelativo intermedio su recurso de apelación. Hoy el Tribunal utiliza la Regla 50 de su Reglamento para expedir y resolver la controversia sin permitir que las partes presenten sus alegatos. 4 L.P.R.A. Ap. XXI-A, R. 50. Como si el abrupto trámite procesal que otorga la

mayoría de este Foro al recurso de autos fuera poco, el Tribunal también decide tomar conocimiento judicial de un hecho adjudicativo esencial para la controversia, sin brindarle a la parte afectada la oportunidad de expresar su postura al respecto. Tal proceder, cuando menos, resulta contrario a los principios básicos de justicia.

La toma de conocimiento judicial de hechos adjudicativos es un medio probatorio que debe ser utilizado con cautela, ello pues se releva a una parte de la carga probatoria que, de ordinario, recae sobre ella. Este mecanismo está disponible para hechos que no están sujetos a controversia razonable por ser: 1) de conocimiento general en nuestra jurisdicción, o 2) de corroboración inmediata y exacta en fuentes que no pueden ser razonablemente cuestionadas. 32 L.P.R.A. Ap. VI, R. 201(b). Sin embargo, cuando una parte solicita al tribunal que tome conocimiento judicial sobre un hecho, ella viene obligada a ofrecer "información suficiente" para que el tribunal pueda conceder su pedido. 32 L.P.R.A. Ap. VI, R. 201(c). *Véase*, *Pérez v. Mun. de Lares*, 155 D.P.R. 697, 705 (2001) ("Para que un tribunal pueda tomar conocimiento judicial de un hecho adjudicativo, es necesario que *la parte proponente ponga al tribunal en condición de poder hacerlo*."). "Si la parte que solicita que se tome conocimiento judicial bajo la Regla 201(B)(2) no le provee al tribunal la información correspondiente, el tribunal no tomará conocimiento judicial y la parte tendrá que presentar evidencia para probar el hecho adjudicativo." Ernesto L. Chiesa, *Reglas de Evidencia de Puerto Rico 2009: Análisis*, San Juan, Publ. J.T.S., 2009, pág. 105.

Ante la norma hasta aquí expuesta, ya se hacen evidentes las deficiencias de la metodología adjudicativa de la mayoría del Tribunal. La Opinión mayoritaria menciona que la Universidad "nos requiere que tomemos conocimiento judicial" de que estudiantes del sistema universitario aprobaron un voto de huelga preventivo. Opinión mayoritaria, págs. 11-12. Tal petición, como veremos, parece encontrarse escondida en una alegación de la Universidad a los efectos de que los estudiantes aprobaron el referido voto preventivo. Estimo, no obstante, que existe una diferencia entre una mera alegación carente de evidencia que la sustente, y una alegación acompañada de una solicitud formal para que se admita en evidencia un hecho mediante la toma de conocimiento judicial.

Incluso, un examen cuidadoso del expediente de autos nos muestra que la única expresión en el recurso de certificación que presentara la administración de la Universidad ante esta Curia, que podría asemejarse a una solicitud para tomar conocimiento judicial, es la siguiente: "Como cuestión de hecho, de lo cual este Honorable Tribunal puede tomar conocimiento judicial, **la prensa ha informado** que en la 'Asamblea Nacional' convocada por los estudiantes el 21 de junio de 2010 se aprobó un 'voto de huelga preventivo' para protestar la imposición de una cuota especial en enero de 2011." Recurso de Certificación, pág. 15 (Énfasis suplido). Si ello fuera considerado como una solicitud de toma de conocimiento judicial, deberíamos concluir que la misma es una sumamente vaga, por lo que el Tribunal debería denegarla de plano.

Por otro lado, las palabras citadas distan mucho de ser lo que la mayoría del Tribunal pretende. Aun en un gran ejercicio de deferencia, no podemos concluir que los peticionarios requieren la toma de conocimiento judicial de la aprobación de un voto preventivo de huelga por parte de los estudiantes. A lo sumo, sólo podríamos pensar que solicitan se tome conocimiento judicial de que *la prensa divulgó una noticia*, pero no que *el evento* del que se habla en la noticia en efecto ocurrió. De manera que, ausente una solicitud de parte para que este Foro tome conocimiento judicial de la aprobación de un voto preventivo de huelga, es forzoso concluir que la mayoría del Tribunal ha decidido hacerlo *motu proprio*.

Ciertamente, las Reglas de Evidencia permiten la toma de conocimiento judicial por iniciativa propia del tribunal en cualquier etapa de los procedimientos. 32 L.P.R.A. Ap. VI, R. 201(c) y (e). **Empero, también garantizan el derecho de las partes a ser escuchadas en torno a si procede la toma de conocimiento judicial**. 32 L.P.R.A. Ap. VI, R. 201(d). "En todo caso, el tribunal debe respetar el derecho de las partes a ser oídas en torno a si bajo la regla 201(B) procede la toma de conocimiento judicial." Chiesa, *op. cit.*, pág. 106. Este inciso de la Regla 201 tiene como propósito garantizar el debido proceso de ley de las partes, de manera que éstas conozcan los hechos que utilizará el foro judicial para arribar a su determinación y tengan, a su vez, la oportunidad de elaborar argumentos a favor o en contra del uso del referido mecanismo

evidenciario.[12]  La importancia de esta salvaguarda procesal se agudiza aún más cuando se toma conocimiento judicial en etapas apelativas, como por ejemplo, en la solución de controversias ante esta Curia.  Al respecto, así se expresa el profesor Ernesto L. Chiesa:

> En relación con tomar conocimiento judicial en la etapa apelativa, es esencial que el tribunal apelativo salvaguarde el derecho de una parte a ser oído en torno a la corrección de tomar conocimiento judicial, ya sea mediante escritos o argumentación oral.  De ordinario, un tribunal apelativo no revocará una decisión del tribunal sentenciador a base de tomar conocimiento judicial de un hecho adjudicativo; por lo general se trata de hechos legislativos.  Si se trata de verdaderos hechos adjudicativos, es necesario que el tribunal apelativo de [sic] a la parte perjudicada oportunidad de ser oída en cuanto a si procede que se tome conocimiento judicial."

Ernesto L. Chiesa, *Tratado de Derecho Probatorio*, San Juan, Publ. J.T.S., 1998, Tomo II, Sec. 13.3, pág. 1150 (Citas omitidas).

A pesar de la claridad y el peso de la doctrina que señalamos, la mayoría de este Tribunal toma conocimiento judicial de un hecho adjudicativo que resulta medular para atender la controversia sobre academicidad, sin tan siquiera hacer un intento por escuchar los planteamientos que pudieran ofrecer los estudiantes recurridos al respecto.  No se les permitió presentar alegatos; tampoco se les ordenó mostrar causa por la cual no se debiera tomar conocimiento judicial del hecho en cuestión.  *Véase* Chiesa,

---

[12] "An elementary sense of fairness might indicate that a judge before making a final ruling that judicial notice will be taken should notify the parties of his intention to do so and afford them an opportunity to present information which might bear upon the propriety of noticing the fact, or upon the truth of the matter to be noticed." *McCormick on Evidence*, 4ta ed., Minnesota, Ed. West, 1992, Vol. 2, Sec. 333, pág. 407 (Citas omitidas).

*Análisis*, *op. cit.*, pág. 105 ("Como se puede tomar conocimiento judicial en la etapa apelativa, el tribunal apelativo debe emitir una orden para que se muestre causa por la que no debe tomarse conocimiento judicial de determinado hecho adjudicativo. Así se satisface lo dispuesto en [la Regla 201(d)].").

El proceder del Tribunal en efecto decomisa el derecho de los estudiantes recurridos de ser escuchados y levantar sus defensas. Así, la Opinión del Tribunal acomete contra los postulados elementales del debido proceso de ley.

IV

Al concluir debo reseñar las elocuentes palabras del ex decano de la Facultad de Derecho de la Universidad de Puerto Rico, el profesor Efrén Rivera Ramos, quien en un ensayo sobre la universidad y lo posible, nos dice:

> [L]a Universidad de Puerto Rico realmente contribuyó a hacer posible otro Puerto Rico en su debido momento. Su existencia amplió el acceso a la educación superior de los sectores menos aventajados. Ha sido centro de ebullición para la irradiación de valores y la circulación de reclamos cruciales para nuestra vida de pueblo. Sus miembros y egresados han participado e intervenido en procesos económicos, sociales, políticos y culturales muy importantes para el país. Con su activismo, sus estudiantes han dado en mas de una ocasión la voz de alerta para que se corrija el rumbo en asuntos medulares de nuestra comunidad. Por otro lado, la histórica lucha por su autonomía y la protección constitucional que ser una universidad pública supone pueden asegurarle mayores espacios de libertad para la investigación, la reflexión, la expresión y la crítica sin los condicionamientos que una institución controlada por intereses económicos privados podría significar.
>
> **Esos espacios de libertad son indispensables para que la universidad pueda continuar siendo el laboratorio de lo posible.**

>    **De más está decir que nuestro país necesita ese laboratorio ahora más que nunca.** (Énfasis nuestro.)

Me hubiese gustado que este Tribunal no "[perdiera] de vista que la mejor manera de salvaguardar el orden en las universidades … es sosteniendo el mandato constitucional: libre expresión para todos." Rafael Martínez Torres, *La Primera Enmienda se va de la Universidad de Puerto Rico: Restricciones Absolutas a los Derechos de Expresión*, Rev. Jur. U.P.R. 665 (1983). Hoy, con su proceder, una mayoría del Tribunal expulsa la libertad de expresión de la Universidad de Puerto Rico.

Anabelle Rodríguez Rodríguez
Juez Asociada

GOBIERNO DE PUERTO RICO

POLICIA

## Miembros de la Comunidad Universitaria y la Ciudadanía en General:

- La Policía de Puerto Rico tiene la obligación de mantener el orden público y proteger la vida y la propiedad de todo ciudadano.

- Nuestra obligación se extiende a la Universidad de Puerto Rico.

- El cumplimiento de esta obligación se llevará a cabo con un alto grado de profesionalismo y respetando los derechos de todos los integrantes de la comunidad universitaria.

- Nuestro compromiso es proteger los derechos civiles de todo ciudadano, incluyendo el derecho de libertad de expresión y asociación.

- Hay áreas designadas en los recintos para realizar manifestaciones de forma pacífica y así garantizar la continuidad de las labores académicas y administrativas.

- Todas las personas deben respetar dichas áreas y demostrar el mayor respeto por la vida, la propiedad y los derechos de todos los integrantes de la comunidad universitaria.

- Pedimos a todos su cooperación para mantener el orden y asegurar la apertura y operación continua de la Universidad.

- Las personas que violen la ley serán procesadas conforme lo establece nuestro ordenamiento jurídico.